On Remand from the Alabama Supreme Court

KELLUM, Judge.[1]
The appellant, Joe Nathan James, Jr., an inmate on death row at Holman Correctional Facility, appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala. R.Crim. P.
In August 1996, James was convicted of murdering Faith Hall during the course of a burglary. He was sentenced to death. In June 1998, this Court reversed James’s conviction and sentence based on the erroneous admission of hearsay evidence during his trial. See James v. State, 723 So.2d 776 (Ala.Crim.App.1998). In June 1999, James was again convicted of capital murder and was sentenced to death. This Court affirmed James’s conviction and sentence on direct appeal. See James v. State, 788 So.2d 185 (Ala.Crim.App.2000).
In May 2002, James filed a Rule 32, Ala. R.Crim. P., petition attacking his conviction and sentence. The circuit court denied relief. We affirmed the circuit court’s ruling. See James v. State, 61 So.3d 332 (Ala.Crim.App.2006). James then petitioned the Alabama Supreme Court for a writ of certiorari. The Supreme Court granted certiorari review to consider whether we erred in sua sponte applying the procedural bars set out in Rule 32, Ala. R.Crim. P., and whether we erred in refusing to review the circuit court’s denial of James’s motion to proceed in forma pau-peris. The Alabama Supreme Court reversed this Court’s judgment based on its earlier decision in Ex parte Clemons, 55 So.3d 348 (Ala.2007), and remanded the case for this Court to consider the merits of James’s ineffective-assistance-of-counsel claims and the in forma pauperis claim. See Ex parte James, 61 So.3d 352 (Ala.2009). Pursuant to the Supreme Court’s instructions we now consider these issues as they were presented by James in his original brief to this Court.
The facts surrounding Hall’s murder are essential to our review of James’s claims of ineffective assistance of counsel. The State’s evidence at James’s 1999 trial tended to show that on August 15, 1992, James shot and killed Hall. Tammy Sneed testified that she and Hall had been out *362 shopping and were returning to Sneed’s apartment on August 15, 1992, when they noticed that James, whom Hall had dated, was following them in a vehicle. They parked at the apartment complex and Hall ran into Sneed’s apartment. Bridget Gregory, a neighbor of Sneed’s, testified that she saw them arrive and that she, Sneed, and Hall went to Sneed’s apartment to talk about what to do about James. James had been following Hall since the two had stopped dating. After some discussion Gregory decided to go to her apartment and telephone the police. Sneed did not have a telephone in her apartment. Gregory said that when she opened the door to Sneed’s apartment James pushed past her and entered the apartment armed with a pistol. She said that James confronted Hall about the man she had been out with the night before. Hall begged James to put the gun down because there were children in the apartment. Gregory testified that James pointed the gun at Hall, that he shot her, and that when Hall fell to the floor James shot her again. James then ran out the back door of the apartment. Sneed also testified that she witnessed James shoot Hall.

Standard of Review

This is a postconviction proceeding that was initiated by James pursuant to Rule 32, Ala. R.Crim. P.
“Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. See Fay v. Noia, 372 U.S. 391, 423-424, 83 S.Ct. 822, 841, 9 L.Ed.2d 837 (1963). It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction. States have no obligation to provide this avenue of relief....”
Pennsylvania v. Finley, 481 U.S. 551, 556-57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).
“[PJostconviction state collateral review itself is not a constitutional right, even in capital cases. Murray v. Giarratano (1989), 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1; Pennsylvania v. Finley (1987), 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539. A postconviction proceeding is not an appeal of a criminal conviction, but, rather, a collateral civil attack on the judgment. See State v. Crowder (1991), 60 Ohio St.3d 151, 573 N.E.2d 652. Postconviction review is a narrow remedy, since res judicata bars any claim that was or could have been raised at trial or on direct appeal.”
State v. Steffen, 70 Ohio St.3d 399, 410, 639 N.E.2d 67, 76 (1994).
According to Rule 32.3, Ala. R.Crim. P., “[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” Although on direct appeal we reviewed James’s capital-murder conviction for plain error, the plain-error standard of review does not apply when an appellate court is reviewing the denial of a postconviction petition attacking a death sentence. See Ex parte Dobyne, 805 So.2d 763 (Ala.2001).[2] “The standard of review this Court uses in evaluating the rulings made by the trial court is whether the trial court abused its discretion.” Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005). *363 However, “[w]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001).
I.
James argues that his trial counsel’s performance was ineffective at both the guilt and the penalty phases of his capital-murder trial.
When reviewing claims of ineffective assistance of counsel, we apply the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must establish: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by counsel’s deficient performance.
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133 — 34[, 102 S.Ct. 1558, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101[, 76 S.Ct. 158, 100 L.Ed. 83 (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2052.
“[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (footnotes omitted).
“While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty *364 only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686, 104 S.Ct. at 2063.
“ ‘The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.’ ”
Jones v. State, 753 So.2d 1174, 1191 (Ala.Crim.App.1999). “[T]he scope of the duty to investigate mitigation evidence is substantially affected by the defendant’s actions, statements, and instructions. As the Supreme Court explained in Strickland, the issue of what investigation decisions are reasonable ‘depends critically’ on the defendant’s instructions.... ” Cummings v. Secretary, Dep’t of Corr., 588 F.3d 1331, 1357 (11th Cir.2009).
“ ‘An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [of effective representation], Therefore “where the record is incomplete or unclear about [counsel]’s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.” ’ Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000) (en banc) (quoting Williams v. Head, 185 F.Sd 1223, 1228 (11th Cir.1999)).”
Grayson v. Thompson, 257 F.3d 1194, 1218 (11th Cir.2001). Moreover,
“[TJhere is no reason for a court deciding an ineffective assistance claim ... even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel’s performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel’s performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.”
Strickland, 466 U.S. at 697, 104 S.Ct. 2052. “It is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied.” Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir.1999).
James was represented at trial by attorneys Virginia Vinson and Gordon Warren.[3] Both Vinson and Warren sub *365 mitted affidavits and testified at the post-conviction evidentiary hearing. Vinson testified that over 85% of her work had been in criminal law, that she had represented defendants in 30 capital trials, and that in at least 10 of those capital cases she had been lead counsel.[4] Vinson’s law partner had represented James in his first capital-murder trial, and Vinson had in her possession his file related to James’s first trial.
A.
James first argues that counsel was ineffective for failing to investigate the background of the victim. Specifically, he asserts that counsel failed to discover that Hall had been arrested for attacking James’s girlfriend, Mara Ruffin. This evidence was vital, he asserts, because it would have led counsel to pursue a claim of self-defense.
When denying relief on this claim, the circuit court stated:
“In his petition, James alleged that trial counsel was ineffective for failing to investigate the background of the victim, Faith Hall. James contends that had counsel done so, they would have learned that Ms. Hall had been previously arrested for attacking James’s girlfriend, Mara Ruffin. James also claimed that the victim actively stalked his girlfriend and filed false police reports against him. James further alleged that he only shot Ms. Hall after she charged him with a knife. James contended that had trial counsel adequately investigated they would have learned these facts and been able to present either a self-defense theory, imperfect self-defense theory, or reduced capability.
“At the evidentiary hearing, James introduced a case action summary from Jefferson County district court that was not discovered by trial counsel. The summary indicated that Ms. Hall had been charged with assault in the third degree in 1990, five years before her murder. The case action summary also indicated that the case was nolle prossed. The Court finds this document irrelevant and immaterial. The arrest occurred five years before her murder and Ms. Hall was never prosecuted. Further, James did not show how the arrest was related to either himself or his girlfriend. Moreover, James has not shown how a five-year old arrest would have supported any self-defense claim.
“James also introduced a complaint against Ms. Hall filed by his then girlfriend, Mara Ruffin, that trial counsel failed to discover. In the complaint, Ms. Ruffin alleged that Ms. Hall broke a windshield with a car jack that caused glass to shatter and cover her. It appears from the documents that the case was later dismissed at Ms. Ruffin’s request. In any event, such evidence concerning the victim would not have been relevant at trial and would have been inadmissible.
“The Court of Criminal Appeals has held that the ‘deceased’s violent nature may be proved only by evidence of reputation and not by specific acts.’ Quinlivan v. State, 627 So.2d 1082, 1084 (Ala.Crim.App.1992). Moreover, any evidence of the victim’s violent character, including opinion or reputation testimo *366 ny, is not admissible in a criminal proceeding where the accused is the aggressor. Bankston v. Alabama, 358 So.2d 1040, 1042 (Ala.1978) (‘It is well understood that evidence of the deceased’s turbulent, violent, and bloodthirsty character is not competent absent some evidence tending to show that the killing was in self defense; that is, some overt act or hostile demonstration on the part of the deceased.’). See also Smith v. State, 466 So.2d 1026, 1031 (Ala.Crim.App.1985) (holding that evidence of the victim’s character is not admissible where the accused is the aggressor).
“The evidence is overwhelming that James was the aggressor. As this Court found in its sentencing order, James, armed with a pistol, forced his way into the apartment occupied by the victim and shot her three times. Without some showing that James acted in self defense, evidence concerning the victim’s character is not admissible. James did allege in his petition that the victim charged at him with a knife. However, James did not present any testimony or evidence at the Rule 32 hearing that supported this allegation. Moreover, the witnesses at trial never indicated that the victim charged James with a knife. Instead, they testified that she was trying to escape when shot. As the aggressor in this case, James cannot demonstrate any facts that would establish a viable theory of self defense, imperfect self defense, or reduced capability. As such, James cannot demonstrate that trial counsel was ineffective.... ”
(C.R. 114-18.)
At the evidentiary hearing, Warren testified that he had no recollection of James telling him about Hall’s prior arrest for assault, nor did he recall the complaint Mara Ruffin had filed against Hall. He testified that he looked at the court records for all the people involved in the case and scanned the statewide database for all circuit court and district court records related to the victim. Warren said that he found nothing he considered to be significant. He said that he would not have found the assault charge to be significant because, he said, it had been nol-prossed and was five years old and the complaint Ruffin filed against Hall had been dismissed. Vinson testified that she did not recall James telling her about Ruffin’s assault charge against Hall but that James was “very uncommunicative.” She said that James told her that he shot Hall after she charged him but that James never referred to Hall’s having a weapon. Both Vinson and Warren stated in their affidavits that James never told them that he acted in self-defense or that Hall had a weapon.
Initially, counsel had no reason to believe that the shooting was in self-defense because James did not tell his attorneys that he acted in self-defense. “Depending on the defendant’s statement to counsel, the need for further investigation may be considerably diminished or eliminated all together.” Levan v. United States, 128 F.Supp.2d 270, 280 (E.D.Pa.2001), citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052
Moreover, all the evidence showed that James was the aggressor and that he pushed his way into Sneed’s apartment and shot Hall multiple times, even after she fell to the floor. There was no evidence from the two eyewitnesses to the shooting indicating that James acted in self-defense.[5] Nor did James present any *367 evidence at the Rule 32 proceedings that he acted in self-defense. Based on James’s statements to his attorneys and the facts of the case, we cannot say that counsels’s actions were unreasonable.
B.
James next argues that his counsel was ineffective for failing to investigate his claim that he was in Atlanta on the day before the shooting. Bridget Gregory testified that she had seen James on the day before the shooting sitting on the stairs outside of Gregory’s and Hall’s apartment with a gun in his lap.
The circuit court stated the following concerning this claim:
“James also alleged that trial counsel was ineffective for failing to investigate his activities prior to the murder. Specifically, James contended that he was in Atlanta the entire day before the murder. James claimed that such evidence would have undermined [Bridget Gregory’s testimony] that he was armed with a gun and sitting outside Ms. Hall’s apartment the day before the murder. James did not present any witness that testified that he was in Atlanta the entire day before the murder. Because James failed to provide any supporting evidence, this claim is denied.”
(C.R. 117-18.) The circuit court correctly denied relief on this claim because at the evidentiary hearing James presented no evidence that he had been in Atlanta on the day before the murder.[6] James failed to meet his burden of proof in regard to this claim. Rule 32.3, Ala. R.Crim. P.
Also, Warren stated the following in his affidavit:
“Joe [James] never said anything to me about going to Six Flags during the time the murder was committed. He told us he went on a trip with a girlfriend. But, it was for some period of time other than the time around the crime. Because of the timing it was not helpful so we did not pursue it. He was talking about a trip the week before the crime. They were in no way connected.”
(C.R. 1185.) Based on the information James furnished to his attorneys, information that was not contradicted in the Rule 32 proceedings, counsel’s conduct in not pursuing this line of defense was not unreasonable.
Furthermore, James cannot satisfy the prejudice prong of the Strickland test. Two eyewitnesses testified that James shot Hall. Several other witnesses, one a police officer, testified that they saw James near Hall’s apartment complex at around the time of the shooting. The evidence against James was overwhelming. Accordingly, any failure to investigate and to present evidence about where James was on the day before the shooting resulted in no prejudice to James.
C.
James next argues that counsel was ineffective for failing to investigate his *368 “dissociative reaction” and his mental health.
The circuit court made the following findings on this claim:
“James also alleges that trial counsel should have investigated and presented evidence that he suffered a dissociative reaction and did not intend to kill the victim. James contended that such information could have been gleamed from friends and family members, medical records; and/or by mental health professionals. James presented testimony from several family members at the Rule 32 hearing. However, none of the family members ever testified that Mr. James suffered from mental health problems or dissociative reactions.
“... Moreover, a psychological report conducted by Dr. Wendy Rebert prior to the first trial indicated that Mr. James exhibited ‘no signs or symptoms associated with a major psychiatric disorder such as psychosis, a thought disorder, or a major effective disorder.”
(C.R. 118.)
Apparently, postconviction counsel relied on a written notation in Vinson’s ease file. In the margin of one of her documents, Vinson wrote, “In a trance.” However, the following occurred during her examination:
“[Postconviction counsel]: In the left-hand margin, there are three words.
“[Vinson]: I am sorry. ‘In a trance.’
“[Postconviction counsel]: ‘In a trance.’
“[Vinson]: Yes.
“[Postconviction counsel]: So was he stating that he was in a trance or an associated state at the time of the crime?
“[Vinson]: I don’t know if that refers to him or her.”
(R. 214-15.)
James did not testify at the postconviction hearing. Also, neither James’s aunt, nor his brother, nor his sister testified that James had any mental problems. There was no evidence that James was in a “trance” at the time of the shooting or that he had any type of mental disorder. Accordingly, James failed to meet his burden of proof in regard to this claim. See Rule 32.3, Ala. R.Crim. P.
Also, the record shows that in 1995 before James’s first trial he was evaluated by Dr. Wendy M. Rebert, a clinical psychologist. Dr. Rebert performed the Competency to Stand Trial Assessment Instrument (“CAI”) and the Wechsler Adult Intelligence Scale — Revised test (“WAIS-R”). James scored a verbal IQ of 102.[7] It was Dr. Rebert’s opinion that James was competent to stand trial and that James was not suffering from any mental defect at the time he shot and killed Hall. Vinson also testified that she was familiar with Dr. Rebert, that she had never found any reason to doubt her judgment, and that she always found Dr. Rebert to be fair and unbiased. Vinson testified she did not think it was necessary to consult another expert based on Dr. Rebert’s examination. “Counsel is not ineffective for relying on an expert’s opinion.” Smith v. State, [Ms. CR-05-0561, September 26, 2008] — So.3d-,-(Ala.Crim.App.2008).
“[T]rial counsel had no reason to retain another psychologist to dispute the first *369 expert’s findings. ‘A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.’ State v. Combs, 100 Ohio App.3d 90, 103, 652 N.E.2d 205, 213 (1994). See also State v. Frogge, 359 N.C. 228, 244-45, 607 S.E.2d 627, 637 (2005). ‘Counsel is not ineffective for failing to shop around for additional experts.’ Smulls v. State, 71 S.W.3d 138, 156 (Mo.2002). ‘Counsel is not required to “continue looking for experts just because the one he has consulted gave an unfavorable opinion.” Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir.1995).’ Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir.1998).”
Waldrop v. State, 987 So.2d 1186, 1193 (Ala.Crim.App.2007).
Furthermore, both Vinson and Warren testified that in their dealings with James they had no reason to doubt his mental health. In both James’s first trial and his second trial he filed numerous pro se motions and often spoke with the circuit court. James was articulate and clearly had a grasp of the legal system and his situation. There is no indication in the numerous documents authored by James and his oral dealings with the circuit court that James had any mental-health issues. In fact, after James’s first capital-murder conviction he requested that the circuit court allow him to represent himself on appeal.[8] He informed the court that he was familiar with the appeal process because he had handled two of his previous appeals and one had resulted in a remand. The circuit court allowed James to represent himself and appointed advisory counsel. (R. 597.) Sometime later in the appeal process James did move that counsel be appointed.
“[NJeither [of defendant’s attorneys] witnessed anything in their frequent and extensive dealings with [the defendant] to indicate that he was afflicted with any mental disorder that might have been relevant to the murder. Cf. Housel v. Head, 238 F.3d 1289, 1296 (11th Cir.2001) (counsel not ineffective for failing to pursue mental health investigation where counsel knew the defendant had suffered a head injury in an automobile accident, but observed nothing unusual about the defendant’s behavior, testifying that he was one of counsel’s ‘most intelligent’ clients); Holladay v. Haley, 209 F.3d 1243, 1252 (11th Cir.2000) (counsel not ineffective for failing to pursue mental health investigation where the petitioner did not tell counsel of his stay at a mental hospital and counsel found the petitioner to be cooperative, articulate, and affable); Williams [v. Head], 185 F.3d [1223] at 1239 [(11th Cir.1999) ] (counsel not ineffective for failing to pursue mental health investigation where counsel had no problems communicating with the petitioner, found the petitioner to be intelligent, attentive, cooperative, polite, and interested in what was happening, to ask intelligent questions and to respond intelligently to counsel’s questions).”
Jefferson v. Hall, 570 F.3d 1283, 1304-05 (11th Cir.2009). See also Breland v. State, 285 Ga.App. 251, 253, 648 S.E.2d 389, 391-92 (2007).
“[T]here is nothing in the record to suggest that [the defendant’s] trial counsel ignored matters that should reasonably have alerted them to [the defendant’s] mental health or to the value of contacting persons who might have information about [the defendant’s] background that might *370 aid in his defense.” Jones v. State, 753 So.2d 1174, 1197 (Ala.Crim.App.1999). Accordingly, James failed to prove by a preponderance of the evidence that his attorneys were ineffective for failing to investigate and present evidence of his alleged “dissociative reaction.”
D.
James next argues that the circuit court erred in denying his sub-claims G, I, J, and K in his Rule 32 petition. This argument in James’s brief consists of approximately one and one-half pages and fails to comply with the requirements of Rule 28(a)(10), Ala. R.App. P.[9] As we stated in Franklin v. State, 23 So.3d 694, 703 (Ala.Crim.App.2008):
“It is well settled that ‘[r]ecitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.’ Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). ‘An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned. This standard has been specifically applied to briefs containing general propositions devoid of delineation and support from authority or argument.’ Ex parte Riley, 464 So.2d 92, 94 (Ala.1985) (citations omitted).”
In the section of James’s Rule 32 petition reproduced in his brief, James asserted that his counsel was ineffective for failing to object when a reference was made to his prior trial and for not objecting to what he says were improper prose-cutorial remarks. Counsel was not questioned about their strategy in relation to these claims. “ ‘[WJhere the record is incomplete or unclear about [counsel’s] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.’ ” Chandler v. United States, 218 F.3d 1305, 1314 n. 15 (11th Cir.2000), quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir.1999).
Also, in regard to James’s claim that counsel failed to object when a witness mentioned his first trial, the record shows that Mohammed Helu stated the following during his testimony at James’s second trial: “I don’t know if it’s the same person or not. But at this present time, honestly speaking, I cannot recognize the person or even three years ago when I was testifying the first time.” (Trial record, p. 9.) Vinson stated in her affidavit that she did not object to Helu’s reference about prior testimony because, she said, she did not want to call attention to the matter. Warren stated in his affidavit that “I didn’t object to Helu’s slip that he had testified before because I did not want to call any more attention to the remark. That was one of those ‘don’t wake the sleeping dog1 issues.” (C.R. 1188.)
The circuit court made the following findings concerning this claim:
“The Court finds that Judge Vinson’s reason for not objecting was a reasonable strategic choice. If she had objected, it certainly would have alerted the jury to the remark and reinforced that James had been previously tried and convicted. James cannot demonstrate either deficient performance or prejudice as required by Strickland. This claim is denied.”
*371 (C.R. 131.) There was no direct reference to a previous trial in Helu’s testimony. Understandably Vinson did not want to call attention to this matter by objecting. Thus, we cannot say that counsel’s performance was ineffective in regard to this claim.
“Objections are a matter of trial strategy, and an appellant must overcome the presumption that ‘counsel’s conduct falls within the wide range of reasonable professional assistance,’ that is, the presumption that the challenged action ‘might be considered sound trial strategy.’ Strickland, 466 U.S. at 687-88, 104 S.Ct. at 2064, 80 L.Ed.2d at 693 (1984).”
Moore v. State, 659 So.2d 205, 209 (Ala.Crim.App.1994).
The circuit court stated the following concerning James’s claim that counsel was ineffective for not objecting to prosecutorial remarks:
“James claimed that trial counsel was ineffective for failing to object to several instances of prosecutorial misconduct. Specifically, James alleged that trial counsel should have objected to the prosecutor’s reference to him as a ‘clown,’ ‘cowboy,’ ‘hambone,’ and ‘coward.’ James also alleged that trial counsel should have objected to the prosecutor suggesting that he owned two guns, for blaming him for inconveniencing the jury, and stating that it was one of the worst crimes he had ever encountered. As an initial matter, the Court notes that James did not question either Mr. Warren or Judge Vinson about this claim at the evidentiary hearing or present any evidence that he was prejudiced by counsel’s actions. Therefore, James failed to meet his burden of proof.
“Moreover, Judge Vinson stated in her affidavit that she did not object to any of the prosecutor’s remarks because she found ‘nothing legally objectionable’ and did not want to alienate the jury by objecting. Judge Vinson also stated that she believed that the prosecutor’s statement suggesting that James may have owned two guns was a reasonable inference from the evidence presented at trial. The Court finds that Judge Vinson’s reasons for not objecting were the result of reasonable strategic choices and analysis of the legal issues involved. As such, James has failed to demonstrate either deficient performance or prejudice as required by Strickland. This claim is denied.”
(C.R. 131-32.)
Vinson stated in her affidavit that she did not object to the prosecutor’s remarks because, she said, she did not want to “alienate the jury.” ‘“[CJounsel’s failure to object to the prosecutor’s summation represents his tactical decision to avoid underscoring the prosecutor’s statements so as to draw the jury’s attention to them.’ Gatto v. Hoke, 809 F.Supp. 1030, 1039 (E.D.N.Y.1992).” Davis v. State, 9 So.3d 539, 552 (Ala.Crim.App.2008). Clearly, counsel’s actions were reasonable; thus, James failed to satisfy the Strickland test.
E.
Next, James argues that his counsel were ineffective at the sentencing phase of his trial because, he asserts, they failed to investigate and present mitigation evidence.
In addressing this claim, the circuit court made the following findings:
“Judge Vinson testified that shortly after her appointment to represent James, she spoke with his grandmother and mother regarding possible mitigation evidence. Neither provided her with any information regarding possible mitigation evidence. It appears that James’s own mother was completely un *372 willing to help in his defense. Judge Vinson stated that when James’s mother surprisingly attended one day of the trial, she again asked her to testify on James’s behalf. Despite her pleas, James’s mother refused.
“Judge Vinson also stated that she spoke with James’s sister, Yosandra Craig, after she too attended one day of the trial. Judge Vinson stated that Ms. Craig related several incidents involving her brother, James. Ms. Craig told her that James was aggressive, violent and overprotective. Ms. Craig also told Judge Vinson that James had broken a former girlfriend’s arm, beat a man at Job Corps, and threatened her stepfather with a gun. Based on her conversation with Ms. Craig, Judge Vinson would not have called her as a mitigation witness. Judge Vinson testified that she believed that Ms. Craig would have done more damage than good. This Court finds that is a reasonable tactical decision based on the information that Ms. Craig had provided.
“In addition to speaking with James’s mother and grandmother prior to trial, Judge Vinson also spoke with James about possible mitigating evidence. Judge Vinson asked James about his family and possible witnesses that could testify during the penalty phase. Judge Vinson also asked if his father had ever abused him. James denied that any abuse ever occurred. Judge Vinson also asked James for permission to put family members on the stand during the penalty phase for mitigation purposes. James, however, refused to provide any names or possible witnesses that could be used for mitigation during the penalty phase of the trial. In fact, James specifically instructed counsel not to involve his family and not to call anyone during the penalty phase. After learning that Judge Vinson spoke with his mother and sister at trial, James became angry and again instructed trial counsel not to call anyone on his behalf. James also refused to testify on his own behalf. Throughout their representation of James, both Mr. Warren and Judge Vinson testified that James was uncooperative and often uncommunicative.
“It is obvious from the record at trial and the evidentiary hearing that trial counsel conducted a limited investigation and did not present any nonstatutory mitigation evidence during the penalty phase. However, in view of the unique circumstances faced by trial counsel, this Court does not find that their investigation or failure to present nonstatutory mitigation evidence constitutes deficient performance under Strickland or as interpreted by the United States Supreme Court in Wiggins v. Smith [, 539 U.S. 510 (2003) ]. Unlike the trial counsel in Wiggins, Mr. Warren and Judge Vinson were faced with a defendant’s family that was unwilling to help and a client who refused to provide counsel with any information. Moreover, James ordered his counsel not to involve his family and not to present any witnesses on his behalf during the penalty phase. The absence of nonstatutory mitigation is attributable not to trial counsel, but to James and his family.
“A competent defendant can waive the presentation of mitigating evidence during the penalty phase. See Nelson v. State, 681 So.2d 252, 255 (Ala.Crim.App.1995). In Adkins v. State, the defendant waived the presentation of mitigating evidence at trial, only to later claim on Rule 32 that trial counsel was ineffective for failing to present mitigating evidence. [930 So.2d 524] (Ala.Crim.App.2004). The Court of Criminal Appeals upheld the denial of the defendant’s ineffectiveness claim stating, ‘a defendant is *373 estopped from raising a claim of ineffective assistance of counsel for counsel’s failure to present mitigating evidence when the defendant waived the presentation of mitigating evidence.’ Id. The Court of Criminal Appeals explained that ‘[to] punish Adkins’s attorneys for following his wishes would conflict with the doctrine of invited error.’ Id.
“James refused to provide counsel with any assistance in procuring mitigating evidence. His family was also unable or refused to assist trial counsel in obtaining mitigating evidence. Finally, James specifically instructed his counsel not to present any mitigation witnesses on his behalf. At trial, James told this Court that he did not wish to present any witnesses on his behalf at the penalty phase. Essentially, James knowingly and voluntarily waived his right to present mitigating evidence on his own behalf. A ‘defendant will not be permitted to allege as error an action at trial that was invited by him or that was a natural consequence of his own actions.’ Duke v. State, [889 So.2d 1] (Ala.Crim.App.2002).
“Clearly, James wished that no mitigating evidence be presented on his behalf. James told Mr. Warren that he would rather be on death row than in the general prison population. James explained that he is treated better on death row, has his own cell and television, and does not have to deal with other people. James cannot now blame trial counsel for failures that were the result of his own actions and desires. In light of James and his family’s unwillingness or inability to assist trial counsel, this Court finds that trial counsel’s investigation and presentation of mitigating evidence was not deficient. As such, this claim is denied for failing to meet the first prong of Strickland. Specifically, James has failed to demonstrate that trial counsel’s representation fell below an objective standard of reasonableness. Chandler [v. United States], 218 F.3d [1305] at 1312-1313 [ (11th Cir. 2000) ] (citing, Darden v. Wainwriglit, 477 U.S. 168 (1986)).”
(C.R. 140-44.)
Warren testified that Vinson was lead counsel, that he was in charge of investigating the facts surrounding the murder, and that Vinson was in charge of mitigation. Vinson’s law partner represented James in his first capital-murder trial. Vinson gave the case file to Warren, he said, and told him to familiarize himself with the case. Warren testified that he could not locate his file on the case, that he did not know the exact number of hours he had spent on the case, and that he did not submit a bill for his work on the case. He said that he had difficulty communicating with James because James often would “not convey any information” and would not talk about the events leading to Hall’s murder. Warren further testified that James did not want to discuss his family and did not want his family in the courtroom. Warren stated in his affidavit that he and Vinson met “50 to 100 times prior to trial,” and that when he met with James for the first time, James said, “I am going to plead guilty, you guys don’t need to do anything.” (C.R. 1182.) Warren also stated that before trial he discovered that James had been speaking to another attorney and that that attorney had arranged for James to plead guilty in exchange for a life sentence. However, on the first day of trial James changed his mind and informed Warren that he was not going to enter a guilty plea. Warren said that he spoke at length to James about this decision:
“I talked to him for a long time and the thing he kept coming back to was that he had it pretty good where he was on *374 death row. He said he had his own television set that he could control and watch what he wanted. He didn’t have to deal with twenty other guys voting on whether to watch football or baseball. He had plenty of reading material. He didn’t have to watch his back and worry about someone sneaking up behind him and clubbing him or stabbing him because he was handled one on one exclusively on death row. The only drawback he said was not getting as much exercise — an hour a day or whatever it was. Otherwise, he was in his cell. He did not want to move in with the general population.”
(C.R. 1192-93.) In conclusion, Warren stated in his affidavit that he felt that James was trying to sabotage his case.
Vinson testified that she spoke to James’s grandmother, his mother, and one of his sisters, and encouraged them to testify on James’s behalf in the penalty phase. James, she said, got angry when he found out that she had spoken to his family and instructed her not to call witnesses on his behalf at his sentencing hearing. Vinson stated in her affidavit that she spoke to James’s mother several months before trial and that she did not want to get involved. Vinson testified that James’s sister did tell her that James had been abused but that when she asked James about it he denied that he had suffered any abuse. Vinson also said that she thought it would hurt James to call his sister to testify because she could also testify about violent acts James had committed in the past.
The record of James’s trial shows that the following occurred before his sentencing hearing:
“[Vinson]: And also, Your Honor, just to put on the record, we have talked with Mr. James yesterday and Mr. Warren has talked with him this morning, we have talked with his mother and sister who are here, and it has been our decision not to present any witnesses as testimony during the sentencing.
“[Prosecutor]: Does he agree to that?
“The Court: Is that correct, Mr. James?
“Defendant: (Nods.)
“[Vinson]: Mr. James agrees with that.”
(Supplemental trial record, p. 9.)
James asserts that the United States Supreme Court’s decisions in Wiggins v. Smith, 589 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), require that counsel conduct and present mitigation evidence even when their client is uncooperative or instructs them not to present such evidence. The United States Supreme Court in Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), held otherwise and stated:
“Neither Wiggins nor Strickland addresses a situation in which a client interferes with counsel’s efforts to present mitigating evidence to a sentencing court. Wiggins, supra, at 523 (‘[W]e focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence of Wiggins’ background was itself reasonable’ (emphasis added and deleted)). Indeed, we have never .addressed a situation like this. In Rompilla v. Beard, 545 U.S. 374, 381 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented. In short, at the time of the Arizona postconviction court’s decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evi *375 dence could not establish Strickland prejudice based on his counsel’s failure to investigate further possible mitigating evidence.”
550 U.S. at 478, 127 S.Ct. 1933. In applying the Supreme Court’s decision in Schriro v. Landrigan, the United States Court of Appeals for the Eleventh Circuit in Cummings v. Secretary, Department of Corrections, 588 F.3d 1331 (11th Cir.2009), stated:
“[W]hen a competent defendant clearly instructs counsel not to investigate or present mitigation evidence, the scope of counsel’s duty to investigate is significantly more limited than in the ordinary case. See Knight v. Dugger, 863 F.2d 705, 750 (11th Cir.1988) (‘Although a capital defendant’s stated desire not to use character witnesses does not negate the duty to investigate, it limits the scope of the investigation required.’); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir.1986) (‘[A] defendant’s decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation.’). Indeed, Strickland tells us that the reasonableness of counsel’s investigation ‘depends critically’ on the defendant’s statements or actions. Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; see also Porter v. McCollum, — U.S.-, 130 S.Ct. 447], at 453 [(2009) ] (noting that ‘although Porter instructed [counsel] not to speak with Porter’s ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview’).
[[Image here]]
“A competent defendant’s clear instruction not to investigate or present mitigation evidence also impacts the prejudice prong of the ineffective assistance test. In Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), the Supreme Court held that the capital defendant Landri-gan could not demonstrate prejudice ‘[b]ecause the Arizona postconviction court reasonably determined that Lan-drigan instructed his attorney not to bring any mitigation to the attention of the [sentencing] court.’ Id. at 477, 127 S.Ct. at 1941-42 (quotation marks and citations omitted); see also id. at 475, 127 S.Ct. at 1941 (stating that ‘[i]f Lan-drigan issued such an instruction [to his counsel not to offer any mitigating evidence], counsel’s failure to investigate further could not have been prejudicial under Strickland ’). Indeed, ‘the judge presiding on postconviction review was ideally situated to make [the] assessment [about what Landrigan instructed his counsel] because she is the same judge that sentenced Landrigan and discussed these issues with him.’ Id. at 476, 127 S.Ct. at 1941. The Supreme Court emphasized that in denying Lan-drigan’s § 2254 petition, the ‘District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence.’ Id. at 477, 127 S.Ct. at 1942.
[[Image here]]
“Our earlier decision in Gilreath v. Head, 234 F.3d 547 (11th Cir.2000) is consistent with Landrigan. There, the defendant Gilreath instructed his counsel to present no mitigation evidence during the penalty phase. Id. at 549-50. This Court denied Gilreath’s ineffective assistance claim on prejudice grounds, stating Gilreath ‘actually must make two showings.’ Id. at 551. ‘First, Petitioner must show a reasonable probability that — if Petitioner had been advised *376 more fully about character evidence or if trial counsel had requested a continuance — Petitioner would have authorized trial counsel to permit such evidence at sentencing.’ Id. ‘Second, Petitioner must establish that, if such evidence had been presented at sentencing, a reasonable probability exists that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ Id. at 551-52 (quotation marks omitted).
“In Gilreath, this Court explained that, ‘[i]n other words, to show prejudice, Petitioner must show that — but for his counsel’s supposedly unreasonable conduct — helpful character evidence actually would have been heard by the jury. If Petitioner would have precluded its admission in any event, Petitioner was not prejudiced by anything that trial counsel did.’ Id. at 551 n. 12. This rule follows naturally from Strickland's formulation of the prejudice prong, for there cannot be a reasonable probability of a different result if the defendant would have refused to permit the introduction of mitigation evidence in any event. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068 (defining prejudice for ineffective-assistance purposes as a ‘reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different’).”
588 F.3d at 1358-60. See Adkins v. State, 930 So.2d 524 (Ala.Crim.App.2001) (holding that a defendant is estopped from raising a claim of ineffective assistance of counsel when he has instructed his attorney not to present any mitigation evidence on his behalf); Whitehead v. State, 955 So.2d 448 (Ala.Crim.App.2006) (holding that a defendant may raise the validity of the waiver of the presentation of mitigating evidence).[10]
“ ‘We have ... emphasized the importance of a mentally competent client’s instructions in our analysis of defense counsel’s investigative performance under the Sixth Amendment.’ Newland [v. Hall], 527 F.3d [1162] 1202 [(11th Cir.2008) ]. Significant deference is owed to failure to investigate made under a client’s specific instructions not to involve his family. Id. at 1203. Assuming [counsel] did not know the details of his client’s background, [the defendant’s] admonishment to him not to contact his family cannot be ignored. We cannot say it would be unreasonable for [counsel] not to discuss [the defendant’s] background with his sisters and mother if [the defendant] indeed instructed him not to contact them out of a sense of protection.”
Blankenship v. Hall, 542 F.3d 1253, 1277 (11th Cir.2008). See Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir.1986) (“[A] defendant’s decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation.”).
Vinson, in contradiction to her client’s wishes, talked to members of James’s family and asked them to testify on James’s behalf. Vinson testified that James became angry when he discovered that she had talked to his mother and sister. Counsel also had the competency report completed by Dr. Rebert, the presentence report from the first trial, the attorney case file from James’s first trial, and other evidence that had been admitted at James’s first trial. This is not a case *377 where the attorneys conducted no investigation. Given the unique circumstances presented in this case we cannot say that counsel’s actions were unreasonable. See Schriro v. Landrigan, supra.
Alternatively, in assessing claims of ineffective assistance of counsel in the penalty phase of a capital trial, we apply the standard discussed in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003):
“In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a ‘defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.’ Id., at 694, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.”
539 U.S. at 534, 123 S.Ct. 2527.
Here, the circuit court found that the omitted mitigating evidence would not have outweighed the aggravating circumstances. The circuit court stated:
“Even assuming that trial counsel’s performance was deficient, James would not be entitled to relief on his penalty phase ineffectiveness because he has failed to demonstrate that he was prejudiced.
“In an effort to demonstrate prejudice, James called the following persons to testify at the evidentiary hearing: Randy Bernstein, Consuela James, Brandon James, and Yosandra Craig. Even if this Court had found that trial counsel’s performance was deficient, the mitigating testimony of these individuals would not have been enough to outweigh the aggravating circumstances in this case.
[[Image here]]
“In light of the testimony presented at the evidentiary hearing, the Court finds that James did have a difficult childhood, marked by the instability of constant moves, poverty, a frequently absent mother, and a completely absent father. However, the Court notes that many people who experience similar or even worse childhoods do not grow up and commit capital murder. In fact, Ms. [Yosandra] Craig [James’s sister], herself, managed to graduate community college and obtain a degree, despite growing up under the same circumstances as James. The Court finds that this non-statutory mitigating evidence should be afforded little weight.
“The Court previously found that two aggravating circumstances existed in this case. First, the capital offense was committed by James while he was under the sentence of imprisonment. Second, the capital offense was committed by James during the course of a burglary. The Court finds that the statutory aggravating circumstances outweigh the non-statutory mitigating circumstances presented at the Rule 32 evidentiary hearing.
“As such, even assuming counsel’s performance was deficient, James has not shown that a reasonable probability exists that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. Chandler, 218 F.3d at 1312-1313 (citing, Darden v. Wainwright, 477 U.S. 168 (1986)). As a result, this claim is denied.”
(R. 145-51.)
The circuit court’s findings are supported by the record. At the Rule 32 evidentiary hearing, James presented the testimony of four individuals. Randy *378 Bernstein, owner of a scrap-metal business, testified that James’s father, Joe Johnson, worked for him on and off for seven years and that he thought that Johnson was mentally ill. He also said that he had never met James. Consuela James, James’s maternal aunt, testified that James had five siblings, that James and his family moved at least 18 times when James was a child, that James’s mother drank when she was pregnant with him, that James was born with droopy eyelids that were corrected through surgery, that James’s mother was married to his father for only about two years, and that when she left James’s father she had many different relationships with men. Brandon Lewis, James’s younger brother, testified that he was 10 years old at the time of the murder, that James was upset on the day of the murder because Brandon had put his bike on some of James’s clothes, and that James has two daughters. Yosandra Craig, James’s sister, testified that she spoke with an attorney during James’s trial and told the attorney that James was always aggressive and that he had broken a girlfriend’s arm. Craig further testified that James frequently took care of his younger siblings and that their childhood was unstable.
In sentencing James to death, the circuit court found two aggravating circumstances: (1) that the murder was committed by a person under sentence of imprisonment, see § 13A-5-49(l), Ala.Code 1975, and (2) that the murder was committed during the course of a burglary, see § 13A-5-49(4), Ala.Code 1975. We agree with the Rule 32 court that the potential mitigating evidence that was presented at the Rule 32 hearing was not compelling and would not have affected the verdict if it had been presented at James’s sentencing hearing. See Wiggins v. Smith, supra.
F.
James next argues that counsel was ineffective for failing to argue that he was incompetent to stand trial.
In our original opinion addressing the denial of James’s Rule 32 petition we addressed the substantive claim that James was incompetent to stand trial. We stated: “[TJhere was not any indication that the appellant was not competent at the time of his second trial. Rather, as set forth herein, the records from his previous appeals directly refute his claim.” James, 61 So.3d at 346. The Supreme Court did not modify our holding related to this issue.
“Because the claims upon which the direct áppeal ineffectiveness claims are based have no merit, counsel’s performance cannot have been deficient by not raising those claims. Moreover, because the underlying claims have no merit, the fact that [the defendant’s] lawyer did not raise those claims cannot have resulted in any prejudice”
Magwood, v. State, 689 So.2d 959, 974 (Ala.Crim.App.1996). Thus, James was due no relief on this claim.
G.
James next argues that counsel was ineffective for failing to request specific jury instructions in the penalty phase. In his brief, James does not identify what jury instructions counsel should have requested.
The circuit court stated the following in regard to this claim:
“James claimed that his trial counsel were ineffective for failing to request specific jury instructions at the penalty phase. As an initial matter, the Court notes that James did not question either Mr. Warren or Judge Vinson about this claim or their failure to request certain *379 jury instructions at the penalty phase.... James did not present any testimony or evidence at the evidentiary hearing that there is a reasonable probability that the outcome of the penalty phase would have been different had trial counsel requested certain jury instructions. As a result of his failure to question trial counsel or to present any evidence in support of this claim, James has failed to demonstrate that counsel’s performance was deficient or that he was prejudiced. As such, these claims are denied.”
(C.R. 153-54.) “The decision whether to request certain jury instructions is a matter of trial strategy.” Myhand v. State, 981 So.2d 988, 992 (Miss.App.2007). See also People v. Lemke, 384 Ill.App.3d 437, 450, 892 N.E.2d 1213, 1224, 323 Ill.Dec. 221, 232 (2008) (“ ‘Counsel’s decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims.... ’ ”); State v. Griffie, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996) (“Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel.”).
In James’s Rule 32 petition he alleged that counsel was ineffective for not requesting a jury instruction on what the jury should do if the aggravating circumstances and the mitigating circumstances were of equal weight, for failing to request an instruction prohibiting the double counting of burglary as both an element of an offense and as an aggravating circumstance, and for not requesting specific instructions on the type and scope of non-statutory mitigating evidence that they could consider.
First, James appears to argue that the instouetions violated the Supreme Court’s decision in Ex parte Bryant, 951 So.2d 724 (Ala.2002), because the instructions failed to instruct the jury what to do if they found that the aggravating circumstances and the mitigating circumstances were equal in weight. In this case, the instructions in the penalty phase were not infected with the error that the Supreme Court found fatal in Ex parte Bryant. In discussing its holding in Bryant, the Supreme Court in Ex parte McNabb, 887 So.2d 998 (Ala.2004), stated:
“The charge in this case was not infected with the peculiar error present in [Ex parte] Bryant, [951 So.2d 724 (Ala.2002),] that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.”
887 So.2d at 1004. Here, the jury was not instructed that it could recommend a death sentence without finding any aggravating circumstance.
Second, requesting an instruction that the jury could not count burglary as both an element of the capital offense and as an aggravating circumstance would be inconsistent with Alabama law. We have consistently upheld the practice of “double-counting” in Alabama. See Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010); *380 Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992).
Third, “[t]his Court has held that the trial court does not have to instruct the jury from a list of specific non-statutory mitigating circumstances provided by the defendant.” Brown v. State, 686 So.2d 385, 403 (Ala.Crim.App.1995), citing Cochran v. State, 500 So.2d 1161 (Ala.Crim.App.1984). The record shows that the jury was given the following instruction on nonstatutory mitigating evidence:
“In addition to the mitigating circumstances previously specified, mitigating circumstances shall include any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”
“[I]t is well settled that an attorney’s failure to assert a futile objection provides no basis for a claim of ineffective assistance of counsel.” Kidd v. State, 277 Ga.App. 29, 34, 625 S.E.2d 440 (2005). “Counsel cannot be held ineffective for failing to raise an issue that has no merit.” Smith v. State, [Ms. CR-05-0561, September 26, 2008]-So.3d --- (Ala.Crim.App.2008). Accordingly, James was due no relief on these claims.
H.
James next argues that counsel was ineffective for failing to object to the use of a 1996 presentence report his 1999 sentencing.
The circuit court made the following findings on this claim:
“James claimed that trial counsel was ineffective for failing to object to the original sentencing report being used at re-trial. At trial, the Court asked if the State or James had anything to add to the original pre-sentence report. Trial counsel for James stated that they did not believe anything needed to be added. James contends that trial counsel should have had the pre-sentence report reflect his good behavior while on death row at Holman Price. In his petition, James argued that pursuant to Skipper v. South Carolina, 476 U.S. 1 (1986), ‘a sentencer may not refuse to consider such evidence.’ James is correct that a sentencer may not refuse to consider such evidence; however, such evidence is not necessarily mitigating. Jenkins v. State, [972 So.2d 111 (Ala.Crim.App.2004)].
“In order to show that counsel was ineffective, James must satisfy the two-pronged test articulated in Strickland. James must show that counsel’s performance was deficient and that he was prejudiced by the deficient performance. In her affidavit, Judge Vinson indicates that she did not request a new sentencing report because she did not believe that James’s behavior on death row was significant. Judge Vinson explained that James had been ⅛ a highly controlled environment’ and was ‘essentially isolated.’ This Court finds that Judge Vinson’s decision not to present such evidence as mitigation was reasonable and does not per se constitute deficient performance.”
(C.R. 154-55.)[11]
Vinson stated the following in her affidavit: “As for the presentence report from the first trial, I did not believe it needed to be updated because the only change would have been his behavior while on death row, *381 which I did not think was significant. Joe had not only been in a highly controlled environment, but was essentially isolated. So, even if he had shown ‘good’ behavior while on death row, I did not feel that would have influenced the court to reject the jury’s unanimous death recommendation.” (C.R. 1179-80.) Warren stated in his affidavit that “I did not think the pre-sentence report needed to be updated since the first trial. He had been on death row the whole time in between trials. His behavior during that time was not significant because he had no opportunity to interact with others on death row. He was just there.” (C.R. 1190.)
“ ‘[Cjounsel could have introduced testimony from jail and prison officials, for evidence like that may not be barred at a capital sentencing hearing. Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Skipper did not also hold, however, that counsel must be deemed ineffective for failing to present available testimony of that nature.’
“People v. Szabo, 186 Ill.2d 19, 29, 237 Ill.Dec. 56, 708 N.E.2d 1096, 1102 (1998).”
Dunaway v. State, [Ms. CR-06-0996, December 18, 2009] — So.3d -, - (Ala.Crim.App.2009).
In addressing whether counsel’s performance was ineffective for failing to present evidence of the defendant’s good conduct in prison, a Missouri court found no prejudice in trial counsel’s failure to present the testimony of three jailers. The court stated:
“First, the issue of Petitioner’s behavior while in jail was not disputed, nor was it a point emphasized by the State. Unlike other cases, the prosecutor here never argued to the jury that Petitioner should get death over life in prison because he would be dangerous to other prisoners. For example, in Skipper, the prosecutor argued that the defendant would be a disciplinary problem while in prison and that he would likely rape other prisoners. 476 U.S. at 3,106 S.Ct. 1669. The Court noted that this argument by the prosecutor made evidence of a peaceful transition to prison life especially relevant and mitigating. Id. at 5 n. 1, 106 S.Ct. 1669. The prosecutor in this case did not specifically rely on a prediction of future dangerousness in asking for the death penalty.
“Second, the three jail workers would have testified to Petitioner’s good behavior while incarcerated, but they all admitted to not being aware of Petitioner’s prior conviction for failing to return to confinement from work release. The State likely would have raised this issue with the witnesses on cross-examination, as it did in the PCR [postconviction relief] hearing. This evidence would have diminished any weight the jurors would have given to the jailers’ testimony. In fact, the jurors might have given no weight at all to the testimony because they may have considered Petitioner’s behavior while awaiting trial — a time when a prisoner has an incentive to behave responsibly in anticipation of his behavior being discussed at trial[12] — to be outweighed by Petitioner’s behavior during earlier times of incarceration, including the time he violated his work release.
“For these reasons, I find no reasonable probability that the testimony of these three jail witnesses would have changed the outcome of the sentencing proceeding.”
*382 Cole v. Roper, 579 F.Supp.2d 1246, 1283 (E.D.Mo.2008).
In this case, the State did not rely on James’s future dangerousness to support a sentence of death. Also, the jury, like counsel and the circuit court, could have given this evidence little weight based on James’s clear incentive to behave well while he was awaiting his second trial and sentencing. We cannot say that James suffered any prejudice by counsel’s failure to present evidence that he had no prison disciplinary actions filed against him while he was on death row awaiting his second trial. See Cole v. Roper, 579 F.Supp.2d at 1283.
II.
James next argues that the circuit court erred in denying his initial motion to proceed in forma pauperis or ex parte on his request for funds to develop his claims of ineffective assistance of counsel.
The record shows that on April 26, 2002, James filed an in forma pauperis request to proceed pro se when filing his Rule 32, Ala. R.Crim. P., postconviction petition. The motion was accompanied by a statement from a prison official that James currently had a balance of $.02 in his prison-inmate account. The motion was denied on May 2, 2002.
On May 7, 2002, James filed a second request to proceed in forma pauperis. No action was taken on this motion until July 6, 2004, when the circuit court granted James indigency status.[13]
The State concedes that the circuit court erred in denying James’s motion to proceed in forma pauperis. We agree. An “indigent” is defined in Rule 6.3, Ala. R.Crim. P., as a person “who is financially unable to pay for his or her defense.” James is indigent as that term is defined in Rule 6.3, Ala. R.Crim. P. However, the State asserts that this error does not require reversal.
First, James argues that according to Lucas v. State, 597 So.2d 759 (Ala.Crim.App.1992), the circuit court erred because it failed to set out its reasons for denying the in forma pauperis request. He also cites Rule 24(a), Ala. R.App. P., in support of his argument that it was error for the circuit court not to make specific findings of fact when denying his request for indi-gency status.
In Lucas this Court stated: “[T]he circuit court may require the payment of that docket fee if the petitioner is not in fact indigent and the finding of the circuit court to that effect is made a part of the record.” 597 So.2d at 760. We did not hold that findings are mandatory or even necessary when denying a request for indigency status. Also, our decision in Lucas was modified by our subsequent decision in Goldsmith v. State, 709 So.2d 1352 (Ala.Crim.App.1997). In Goldsmith, we held that a petition for a writ of mandamus — rather than appeal — is the proper method for seeking review of a ruling denying a request to proceed in forma pauperis.
Also, Rule 24(a), Ala. R.App. P., states:
“Leave to Proceed In Forma Pauperis From Trial Court to Appellate Court. A party to an action in a court who desires to proceed on appeal in forma pauperis shall file in the trial court a motion for leave so to proceed, together with an affidavit showing, in the detail prescribed by Form 15 of the Appendix of Forms, the party’s inability to pay fees and costs or to give security there *383 for, the party’s belief that he or she is entitled to redress, and a statement of the issues which the party intends to present on appeal. If the motion is granted, the party may proceed without further application to the appellate court and without prepayment of fees or costs in either court or the giving of security therefor. If the motion is denied, the trial court shall state in writing the reasons for the denial.”
Rule 24(a), Ala. R.App. P., only applies when a person is seeking to proceed on appeal in forma pauperis. It does not apply to the initial filing of a request for indigency status in the circuit court.
Moreover, “Because the law is clear that Rule 32 petitioners are not entitled to funds to hire experts to assist in postcon-viction litigation, ex parte or otherwise, the trial court did not err in denying the motion. Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003).” Johnson v. State, [Ms. CR-05-1805, September 28, 2007] — So.3d -, - (Ala.Crim.App.2007). See also Bush v. State, [Ms. CR-03-1902, May 29, 2009] — So.3d - (Ala.Crim.App.2009); Burgess v. State, 962 So.2d 272 (Ala.Crim.App.2005); Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003); Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000); Ford v. State, 630 So.2d 111 (Ala.Crim.App.1991); Hubbard v. State, 584 So.2d 895 (Ala.Crim.App.1991).
“Contrary to McGahee’s assertions, the trial court was not obliged to allow him to proceed ex parte in his request for funds to pursue his postconviction claims. McGahee’s reliance on Ake v. Oklahoma[, 470 U.S. 68, 105 S.Ct. 1087, (1985) ] is misplaced because postconviction proceedings pursuant to Rule 32, Ala. R.Crim. P., are not criminal in nature. McGahee, himself, pursued this discretionary legal action against the State of Alabama, and the action is civil in nature. See Hamm v. State, 913 So.2d 460, 471 (Ala.Crim.App.2002), and cases cited therein. This Court held that the fundamental fairness mandated by the Due Process Clause does not require the trial court to approve funds for experts at a postconviction proceeding. Hubbard v. State, 584 So.2d 895, 900 (Ala.Crim.App.1991). Moreover, this Court has specifically held that Ake is not applicable in postconviction proceedings. Ford v. State, 630 So.2d 111, 112 (Ala.Crim.App.1991), aff'd, 630 So.2d 113 (Ala.1993). See also Williams v. State, 783 So.2d 108 (Ala.Crim.App.2000), aff'd, 662 So.2d 929 (Ala.1992) (table).
“McGahee’s reliance on Ex parte Moody, 684 So.2d 114 (Ala.1996), is misplaced. In Moody, the Alabama Supreme Court held that ‘an indigent criminal defendant is entitled to an ex parte hearing on whether expert assistance is necessary, based on the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.’ 684 So.2d at 120. As discussed above, for purposes of this proceeding, McGahee is not ‘an indigent criminal defendant.’ Instead, he is a convicted capital murderer who, in Rule 32 proceedings, is a civil petitioner with the burden of proving that he is entitled to relief on the grounds alleged in the petition he filed. Moody does not support McGahee’s argument here. McGa-hee is not entitled to any relief on this claim of error. The trial court did not err when it denied an ex parte hearing on McGahee’s request for funds.”
McGahee v. State, 885 So.2d 191, 229 (Ala.Crim.App.2003).
For the foregoing reasons, the circuit court did not commit reversible error in initially denying James’s motion to proceed in forma pauperis and his motion to proceed ex parte in his request for funds for expert assistance for his postconviction proceedings.
*384 Accordingly, we affirm the circuit court’s denial of relief on the grounds addressed in this opinion.
AFFIRMED.
WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.

. Judge Kellum was not a member of the Court of Criminal Appeals when the original opinion in this case was issued. This case was assigned to Judge Kellum on January 20, 2009.

. The federal courts also apply this rationale to collateral proceedings attacking a criminal conviction. As the United States Supreme Court stated in Murray v. Giarratano, 492 U.S. 1, 9, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989): "We have similarly refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus.”

. At the time of the evidentiary hearing in the Rule 32 proceeding Vinson was a judge in the Jefferson Circuit Court.

. “When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.’’ Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir.2000). See also Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir.1998) (“Our strong reluctance to second guess strategic decisions is even greater when those decisions are made by experienced criminal defense counsel.”).

. Rule 32 counsel asserts in his brief to this Court that evidence of Hall’s specific prior acts of violence would have been admissible at James’s trial if he had relied on self-de *367 fense. However, in Quinlivan v. State, 627 So.2d 1082, 1084 (Ala.Crim.App.1992), we stated: "Alabama follows the rule that the deceased’s violent nature may be proved only by evidence of reputation and not by specific acts.”

. James argues on appeal that the circuit . court erred in not issuing a bench warrant for Mara Ruffin’s arrest when she failed to appear at the postconviction evidentiary hearing. Ruffin, he asserts, could have testified that he was in Atlanta with her on the day before the murder. We specifically addressed this issue in our previous opinion in this case and found no error. James, 61 So.3d at 343 On certiorari review the Alabama Supreme Court did not modify our holding in regard to this issue.

. The scores on this test were consistent with an IQ test that had been administered to James when he was approximately 10 years of age. James’s performance IQ when he was 10 years old was 102. (C.R. 2111.)
James appears to argue in his brief that he is retarded. The record clearly shows that James does not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002).

. We take judicial notice of our records related to the appeal of James’s first capital-murder conviction in CR-96-0405. See Nettles v. State, 731 So.2d 626 (Ala.Crim.App.1998).

. Rule 28(a)(1), Ala. R.App. P., states, in part, that an appellant’s brief shall contain: “An argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relief on."

. These cases were both released before the United States Supreme Court released its decision in Schriro v. Landrigan.

. In the alternative, the circuit court found that James failed to introduce any of his prison records to support this claim. The record shows that James's prison records were introduced and those records show that James had no disciplinary actions while he has been incarcerated on death row. (C.R. 2446-2519.)

. As Justice Powell cautioned in his concurring opinion in Skipper, a defendant in prison awaiting sentence "has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life.” 476 U.S. at 14, 106 S.Ct. 1669.

. The record does show that on May 20, 2002, a $154 filing fee was paid to the Jefferson County circuit clerk.