NOTICE

Decision filed 07/31/08. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-07-0064

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellee, | ) Edwards County. |
| | ) |
| v. | ) No. 01-CF-49 |
| | ) |
| KENNETH R. LEMKE, | ) Honorable |
| | ) Mark L. Shaner, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

Following a jury trial in the circuit court of Edwards County, the defendant, Kenneth R. Lemke, was convicted of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2000)). On appeal from his conviction, the defendant argues that his murder conviction should be reduced to involuntary manslaughter (720 ILCS 5/9-3(a) (West 2000)) and that, alternatively, he should be granted a new trial because he was denied the effective assistance of counsel. For the following reasons, we affirm the defendant's conviction for first-degree murder.

BACKGROUND

In November 2001, the defendant and his stepson, Lance Albertson, were involved in an altercation that resulted in Albertson's death. It is undisputed that the incident began as a verbal dispute and ended when Albertson was shot in the head with a round fired from a .22-caliber revolver.

In April 2002, following a bench trial in the circuit court of Edwards County, the defendant was convicted of first-degree murder. On appeal, the defendant argued that the evidence presented for the trial court's consideration did not support a conviction for first-

1

degree murder and that "his trial counsel's failure to present the defense that the defendant had committed the lesser offense of involuntary manslaughter constituted the ineffective assistance of counsel." *People v. Lemke*, 349 Ill. App. 3d 391, 392, 396 (2004). Agreeing with the defendant's latter contention, this court reversed and remanded for a new trial. *Lemke*, 349 Ill. App. 3d at 398, 402.

In October 2006, the defendant was retried before a jury, which also found him guilty of first-degree murder. The following occurred at the jury trial.

Jack Russell Heindselman testified that on November 3, 2001, he and Albertson had gone to the defendant's home in rural Edwards County after having gone bow hunting for deer. Heindselman stated that he and Albertson arrived at the defendant's sometime after dark and that the defendant was not present at the time. When the defendant later returned home, Heindselman was inside the house and Albertson was "out in the shed working on something." The defendant and Albertson had been "arguing that day," and the defendant seemed enraged about something. The defendant then went out to the shed to talk to Albertson but soon returned, grabbed a walking stick, and stated, "He's not going to talk to me that way." The defendant then exited the house again. At that point, Heindselman decided to go outside to "see what was going on." Once outside, Heindselman saw the defendant and Albertson wrestling. After winning the wrestling match, Albertson grabbed the walking stick and walked away from the defendant. As Albertson was subsequently loading up his four-wheeler to leave, the defendant went back inside the house and "walked back out with a gun." Heindselman indicated that the defendant had held the gun directly in front of him "like he was going to walk up and shoot somebody" and approached Albertson. When Heindselman asked the defendant what he was doing, the defendant stopped for a moment but then continued towards Albertson. Albertson, who was standing on the back of the four-wheeler with the walking stick in his hand, asked the defendant what

2

he was doing and then urged him to "stop it." Heindselman then heard a gunshot and saw Albertson fall. Heindselman testified that the defendant was six to eight feet from the four-wheeler at the time. Heindselman subsequently went to Albertson and saw that he had been shot in the forehead and was apparently dead. The defendant also went to Albertson, and Heindselman told him to call 9-1-1.

When cross-examined, Heindselman admitted that when he checked Albertson's condition after the shooting, he had removed from one of Albertson's pockets a light bulb that Albertson had used to smoke methamphetamine earlier in the day. Heindselman denied using methamphetamine himself that day, but he acknowledged that he had used it on other occasions, that at the time of his testimony he was serving a sentence on a methamphetamine-related charge, and that he had other prior methamphetamine-related convictions. He further acknowledged that although his testimony suggested that the defendant had meant to shoot Albertson, he had previously told Deputy Scott Meserole that he thought it had been an accident. Heindselman explained that after later considering that the revolver in question had to be manually cocked before it could be fired, he thought that the shooting "was not an accident." Heindselman admitted that he had been drinking beer prior to the events in question and was intoxicated when the events occurred. He testified that he did not remember telling the police that he had "looked away" prior to hearing a gunshot. He also admitted that two weeks before the trial, he had sent a letter to the Edwards County State's Attorney asking him to intervene in some administrative matters that had arisen with the Department of Corrections.

On redirect, Heindselman testified about the circumstances that prompted him to ask the Edwards County State's Attorney for help in dealing with the Department of Corrections. He explained that as a result of being subpoenaed to testify at the defendant's trial, he had been transferred to a maximum security facility and had lost his work-release status. He

3

further stated that being subpoenaed had also resulted in his inability to complete the programs and classes in which he had been enrolled and that he had thus lost good-time credit toward his sentence. Heindselman testified that nothing had changed since he had written the letter to the State's Attorney and that he had not been promised anything in exchange for his testimony.

The defendant called 9-1-1 after the shooting, and the recording of the defendant's call was played for the jury. On the recording, the defendant can be heard stating, *inter alia*, "[Albertson] jerked the gun out of my hand." The defendant can also be heard attempting to revive Albertson with CPR.

Edwards County Sheriff Scott Meserole testified that he was a deputy sheriff on November 3, 2001, and that he responded to the scene of the shooting shortly after it had been reported. Meserole testified that he spoke with both the defendant and Heindselman, that a revolver that had been on the ground near Albertson's body was collected as evidence, that the defendant had been crying, and that the defendant's speech was somewhat slurred.

Edwards County Coroner Mark Curtis testified that he pronounced Albertson dead at the scene and that he was present when the revolver found near Albertson's body was secured as evidence. Curtis testified that the revolver's cylinder contained five live rounds and one spent round and that the hammer was down on a live round with the spent round to the right of it. An autopsy revealed that Albertson died from a single gunshot wound to the head. The fatal bullet traveled in a "slightly upward" trajectory and "passed through the right side of the brain." Albertson's blood tested negative for the presence of alcohol but positive for the presence of amphetamine and methamphetamine.

Michael Cooper, a forensic firearms expert with the Illinois State Police, testified that he had examined the revolver that was found at the crime scene. Cooper testified that the weapon was a single-action revolver, which, in contrast to a double-action revolver, requires

a person to manually pull the gun's hammer completely back to "fully cock" the weapon before it will fire. Cooper further testified that a spent cartridge would remain under the hammer "in line with the barrel" of the gun and that the weapon would have to be cocked a second time to rotate the cylinder to align "the next cartridge." Cooper stated that the revolver's trigger-pull was within the "normal range" of that of similar weapons that he had inspected over the years. Cooper acknowledged that he had not test-fired the revolver.

At the close of the State's case, defense counsel moved for a directed verdict. Counsel argued, *inter alia*, that, at most, the State had proven that the defendant had committed second-degree murder or involuntary manslaughter. The trial court denied the defendant's motion for a directed verdict, and the defendant presented the following evidence in his defense.

The defendant's personal physician, Dr. Timothy Garrett, testified that he had treated the defendant for carpal tunnel syndrome and for a sciatic nerve problem related to a back injury. Garrett stated that the defendant had been diagnosed with "severe carpal tunnel syndrome in the right hand and mild to moderate carpal tunnel in the left hand." Garrett explained that carpal tunnel is "a nerve entrapment" that can result in severe numbness and tingling to an affected area. Garrett testified that the condition can cause one's thumb and index finger to be unable to "feel things" and can thus complicate tasks such as buttoning a shirt. Garrett further testified that the defendant had been prescribed the tranquilizer Xanax for anxiety and stress. The Xanax was prescribed "as needed" in the amount of one milligram per day.

Sharon Duvall testified that she was the defendant's girlfriend in November 2001. Duvall testified that on the night of the shooting, she and the defendant had drinks at a bar in Grayville from approximately 7 p.m. to 9:30 p.m. Duvall stated that when the defendant arrived at the bar, he was "already drunk" and he claimed that he had already consumed an

5

18-pack of beer. While at the bar, the defendant drank Jack Daniels and Coke and "a couple beers." When he left the bar, he said that he was going home to "check on" Albertson and Heindselman. To no avail, Duvall had tried to convince the defendant that he was in no condition to drive. Duvall stated that she had spoken with the defendant after the shooting, which she referred to as "the accident."

The defense next called Sheriff Meserole as a witness. Meserole testified that after interviewing Heindselman on the night of the shooting, he applied for a warrant to search the defendant's premises. When presented with the application for the warrant, which was marked "Defendant's Exhibit C," Meserole identified it and acknowledged that it contained the following language: "Heindselman reported that based on his knowledge of [the defendant] and his observations, he believed the shooting to be accidental." During the State's cross-examination of Meserole, after Meserole explained that the contents of "Defendant's Exhibit C" represented the "best information that [he] had at the time," the State admitted the exhibit into evidence without objection. When "Defendant's Exhibit C" was admitted into evidence, defense counsel stated that he wanted to "clarify" that he had presented "Defendant's Exhibit C" and that he "was going to ask that it be admitted into evidence." During a break in the proceedings, the State acknowledged that Heindselman's statement that "this was an accident" was "in as substantive evidence."

Trooper Jesse King of the Illinois State Police testified that he interviewed Heindselman after the shooting and that Heindselman appeared upset and "fairly intoxicated" at the time. King testified that Heindselman indicated that he had "looked away" when the shot was fired and had only seen the defendant pointing the gun at Albertson. According to King, Heindselman further indicated that Albertson had been holding the walking stick "in a defensive manner" when he was shot. King testified that Agent Bryan Harms was present during a part of the interview.

6

Special Agent Bryan Harms of the Illinois State Police testified and confirmed that he had been present for a part of the interview. Harms further testified that during the interview, Heindselman stated that Albertson had been holding the walking stick in a defensive manner "moments before he was shot."

Dr. Jonathan Lipman, an expert in the field of neuropharmacology, testified that he had researched the defendant's use of Xanax and had discovered that the defendant had not been "using it the way it was prescribed." Lipman explained that when the defendant took Xanax, "he would drink on top of it," which is "not recommended." Lipman further explained, "[T]he intoxication that results from the combination [of alcohol and Xanax] is catastrophically more disabling than the use of either the drug alone or the alcohol alone." Lipman testified that after studying the defendant's case, he believed that the defendant's judgment, reasoning, and "emotional regulation" had been severely impaired on the night in question. Lipman opined that because the defendant had been under the combined influence of alcohol and Xanax, he had misperceived the circumstances of his altercation with Albertson, and "ultimately he behaved foolishly[,] *** even say recklessly, as a result of his intoxication." Lipman further opined that the defendant did not "appreciate the dangerousness and, therefore, the recklessness of his actions" and that a chronic user of alcohol would not "necessarily be unable to speak clearly" while under the influence of alcohol and Xanax. Lipman also testified that the level of methamphetamine detected in Albertson's blood suggested that Albertson was "a user of very large doses" of the drug and that Albertson's possession of the methamphetamine "smoking pipe" suggested that Albertson's use was "severe." Lipman stated that methamphetamine use can result in delusions, hallucinations, and unreasonable aggression.

The defense rested after the defendant had advised the court that he did not wish to testify on his own behalf. The State then called Trooper King to the stand as a rebuttal

7

witness.

Trooper King testified that at the scene of the shooting, he had observed the defendant for approximately an hour and was present when the defendant was later interviewed. King then stated that, in his opinion, the defendant "was not intoxicated to the point that he did not understand what was being asked of him."

Sheriff Meserole and Agent Harms also provided rebuttal testimony. Sheriff Meserole testified that he was the first officer to arrive at the scene and that, although the defendant had spoken with "slurred speech," the defendant was responsive to his questions and was able to "make sense" when communicating. The defendant also poured himself a glass of iced tea and took some medication in Meserole's presence. Agent Harms indicated that when he interviewed the defendant approximately three hours after the incident, the defendant was obviously intoxicated but was "coherent" and "responded appropriately" to his questions.

During closing arguments, the State maintained that although the defendant's judgment might have been impaired at the time of the shooting, he knew what he was doing when he retrieved the revolver and fired the round that struck Albertson in the head. The State argued that because the revolver had to be cocked before it would fire, the shooting was "not an accident" or the result of "mere recklessness." The State argued that the defendant was guilty of first-degree murder because he knew that "by pointing that gun in the direction of Lance Albertson and pulling the trigger *** he created the strong possibility of death or great bodily harm." The State suggested that Heindselman had initially stated that he believed that the shooting was an accident because he felt sorry for the defendant.

In response, defense counsel repeatedly emphasized that "right after" the shooting, Heindselman had told the police that "it was an accident." At one point when discussing Heindselman's prior inconsistent statement, counsel specifically referred to "Defendant's Exhibit C." Reminding the jury that Heindselman was a "meth user" serving time for a

8

methamphetamine-related conviction, counsel argued that Heindselman's trial testimony was "self-serving" and unreliable. Counsel maintained that Heindselman had testified that the shooting was not an accident because he thought that the testimony "might benefit" him. Counsel argued that, "[as a matter of] common sense and experience, what [one] say[s] right after something happens is most likely closer to the truth than what [one] say[s] on reflection months later [or] years later." Referring to Heindselman as the State's "star witness," counsel suggested that without Heindselman's trial testimony, the State had little more than "supposition" and had failed to prove the defendant guilty of anything beyond a reasonable doubt. Counsel further suggested that, at most, the State's evidence established that the defendant had committed involuntary manslaughter. When discussing the mental states of murder and involuntary manslaughter, counsel advised the jury that the judge, "in his instructions," was "going to define [']knowledge['] [and] [']intent,['] " but counsel referred to Dr. Lipman's testimony when discussing "recklessness." Counsel suggested that the revolver had gone off as a result of the defendant's "bad hand" and intoxicated condition, and counsel stated, "There was no way that [the defendant] intended to kill Lance Albertson." Counsel urged the jury to exercise its "option" of finding the defendant guilty of involuntary manslaughter if it determined that the defendant was criminally responsible for Albertson's death.

In rebuttal, the State reminded the jury that Heindselman had been promised nothing in exchange for his testimony. The State further reminded the jury that Heindselman had testified that, although he had initially said that the shooting was an accident, he later changed his mind after learning that the revolver in question "had to be cocked and the trigger pulled in order for it to fire." The State argued that despite his intoxication and carpal tunnel syndrome, the defendant had committed first-degree murder when he "pointed that weapon at [Albertson] and killed him."

9

After receiving instructions on, *inter alia*, first-degree murder and involuntary manslaughter, the jury returned a verdict finding the defendant guilty of first-degree murder. The trial court subsequently sentenced the defendant to a 22-year term of imprisonment, and the defendant filed a timely notice of appeal.

## ANALYSIS

### Sufficiency of the Evidence

The defendant first argues that his murder conviction must be reduced to involuntary manslaughter because the State's evidence was insufficient to sustain the jury's finding that he was guilty of first-degree murder. The State counters that it was "neither impossible nor unreasonable for the jury to find the essential elements of the crime of murder, rather than involuntary manslaughter, beyond a reasonable doubt." We agree with the State.

"A reviewing court will not set aside a criminal conviction on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. When considering the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. Rather, the relevant question is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001).

A defendant commits first-degree murder under section 9-1(a)(2) of the Criminal Code of 1961 when in performing the acts that cause the death of an individual, "he knows that such acts create a strong probability of death or great bodily harm." 720 ILCS 5/9-1(a)(2) (West 2000). A person commits involuntary manslaughter when he unintentionally kills an individual by recklessly performing an act that is likely to cause death or great bodily harm. 720 ILCS 5/9-3(a) (West 2000). "The basic difference between involuntary manslaughter and first[-]degree murder is the mental state that accompanies the conduct

10

resulting in the victim's death," and whether a defendant is guilty of first-degree murder or the lesser offense of involuntary manslaughter is a question for the trier of fact. *People v. DiVincenzo*, 183 Ill. 2d 239, 249, 253 (1998). Whether a defendant acted knowingly or recklessly may be inferred from circumstantial evidence, and "inferences as to [a] defendant's mental state are a matter particularly within the province of the jury." *DiVincenzo*, 183 Ill. 2d at 252-53.

It is well established that proof that a death resulted from a defendant's act of deliberately firing a gun in the general direction of his victim is sufficient to sustain a conviction for first-degree murder under section 9-1(a)(2). *People v. Thomas*, 171 Ill. 2d 207, 219 (1996); see also *People v. Bartall*, 98 Ill. 2d 294, 306-09 (1983). That is the case because it is not necessary to prove that the defendant had a specific intent to kill or do great bodily harm or that he knew with certainty that his acts would achieve murderous results. *People v. Howery*, 178 Ill. 2d 1, 42 (1997). A person who is aware that his acts create a strong probability of death to another may be found guilty of first-degree murder under section 9-1(a)(2) even if the victim's death was "caused 'unintentionally.' " *People v. Deacon*, 130 Ill. App. 3d 280, 287-88 (1985). "To sustain a murder conviction under section 9-1(a)(2), there must be evidence from which the trier of fact could infer that the defendant knew, *at minimum*, that his acts created a strong probability of great bodily harm to another individual; that the defendant acted; and that the act resulted in the death of another." (Emphasis in original.) *People v. Mifflin*, 120 Ill. App. 3d 1072, 1077 (1984).

Here, viewing the evidence adduced at the trial in the light most favorable to the State, the jury could have reasonably concluded that after retrieving the revolver from inside the house, the defendant deliberately fired it at Albertson knowing that doing so created a strong probability of death or great bodily harm. In and of itself, the evidence establishing that the revolver had to be manually cocked before it would fire and that the weapon was apparently

11

cocked again after Albertson had been shot supports the inference that the defendant's act of firing the gun was a deliberate act despite his intoxication and carpal tunnel syndrome. Additionally, the evidence that the defendant and Albertson were engaged in an escalating altercation when the defendant retrieved the revolver provided a motive for the shooting. See *People v. Smith*, 141 Ill. 2d 40, 56 (1990). The jury could have also viewed the defendant's claim that Albertson had jerked the gun out of his hand as a "false exculpatory statement" reflecting the defendant's consciousness of guilt. *People v. Milka*, 211 Ill. 2d 150, 181 (2004). On appeal, the defendant points to, *inter alia*, Dr. Lipman's conclusions that he had behaved "recklessly" and had failed to appreciate the "recklessness of his actions," but a jury "is free to disregard the testimony of any expert." *People v. McGee*, 88 Ill. App. 3d 447, 453 (1980). We also agree with the State's observation that the cases upon which the defendant relies in support of his claim that his conviction must be reduced "are all readily distinguishable from the case at bar." In any event, because the evidence of the defendant's guilt is not so improbable or unsatisfactory that there exists a reasonable doubt of his guilt, we will not disturb the jury's verdict, and accordingly we deny the defendant's request that we reduce his conviction.

Ineffective Assistance of Counsel

Alleging that he was denied the effective assistance of counsel, the defendant next asks that we reverse his conviction and grant him a new trial. The defendant's ineffective assistance claims are without merit, however, and we accordingly affirm his conviction.

To succeed on a claim of ineffective assistance of trial counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). "Under *Strickland*, a defendant must prove not only that defense counsel's performance fell below

an objective standard of reasonableness, but also that this substandard performance caused prejudice by creating a reasonable probability that, but for counsel's errors, the trial result would have been different." *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005). "Because [a] defendant must satisfy both prongs of the test, the failure to satisfy either element precludes a finding of ineffective assistance of counsel under *Strickland*." *People v. Shaw*, 186 Ill. 2d 301, 332 (1998).

With respect to the first prong of the *Strickland* test, judicial scrutiny of a counsel's performance is "highly deferential," and a defendant who claims that his counsel was ineffective must overcome the strong presumption that the challenged actions were the product of sound trial strategy or tactics. *People v. Metcalfe*, 202 Ill. 2d 544, 561 (2002). "Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." *Patterson*, 217 Ill. 2d at 441. Furthermore, the fact that another attorney with the benefit of hindsight would have handled the defendant's case differently does not establish that trial counsel's performance was deficient. *People v. Dobbs*, 353 Ill. App. 3d 817, 827 (2004).

On appeal, the defendant raises two claims of ineffective assistance of trial counsel. The first pertains to Heindselman's statement to Meserole that the shooting was an accident. Suggesting that trial counsel was unaware of the prior inconsistent statement's evidentiary value, the defendant argues that trial counsel was ineffective for failing to request that the statement be admitted as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2006)) and for failing to request that the jury be instructed that it could consider the statement as substantive evidence (see Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (hereinafter IPI Criminal 4th)). The defendant asserts that he was prejudiced by these failures because the jury could only consider the statement for impeachment purposes and because counsel's use of the

13

statement during closing arguments was similarly limited. See *People v. Wilson*, 149 Ill. App. 3d 1075, 1078-79 (1986). Having closely reviewed the record on appeal, we conclude that the defendant's contentions are misleading and unsupportable.

Pursuant to section 115-10.1, a witness's prior inconsistent statement is admissible as substantive evidence if the statement is inconsistent with his trial testimony, the witness is subject to cross-examination regarding the statement and acknowledges under oath that he made it, and the statement describes or explains an event of which the witness had personal knowledge. 725 ILCS 5/115-10.1 (West 2006). Here, the record demonstrates that defense counsel and the State were both aware that Heindselman's statement that the shooting "was an accident" was a prior inconsistent statement admissible as substantive evidence pursuant to section 115-10.1. The record further demonstrates that, during the defendant's case in chief, trial counsel intended to introduce Heindselman's prior inconsistent statement into evidence via "Defendant's Exhibit C" but "failed" to do so only because the State introduced the exhibit first. Notably, after "Defendant's Exhibit C" was admitted into evidence, the State acknowledged that Heindselman's prior inconsistent statement was "in as substantive evidence." Thereafter, during closing arguments defense counsel extensively argued the truth of Heindselman's prior inconsistent statement, and on defense counsel's motion, the jury had "Defendant's Exhibit C" in its possession during deliberations. Heindselman's prior inconsistent statement was thus used substantively (see *People v. Smith*, 362 Ill. App. 3d 1062, 1091-92 (2005) (Theis, J., specially concurring)), and the defendant's claims to the contrary are without merit. Of the utmost significance, however, is that Heindselman's prior inconsistent statement was admitted and used as substantive evidence by virtue of the fact that the jury's use of the statement was not limited by the trial court's instructions. At oral argument, the parties on appeal asserted that the jury had been given a prior-inconsistent-statement "impeachment instruction" (*i.e.*, IPI Criminal 4th No. 3.11), which would have

14

advised the jury that it could only consider Heindselman's prior inconsistent statement for impeachment purposes. That assertion, however, is belied by the record. The jury was not given *any* instruction regarding or limiting the use of a witness's prior inconsistent statement, which is precisely why the jury was free to consider Heindselman's prior statement as substantive evidence. See *People v. Mulvey*, 366 Ill. App. 3d 701, 714-15 (2006) (noting, "[I]f no request is made to have the jury advised that a prior inconsistent statement was admitted solely to impeach, the statement[] may be considered as substantive evidence by the jury"); *People v. Waln*, 169 Ill. App. 3d 264, 275 (1988) (noting, "Since no limiting instruction was given in this case, the jury must have considered the [prior inconsistent statements] substantively, as any other piece of evidence"); IPI Criminal 4th No. 3.11, Committee Note, at 96 (explaining, "all evidence is substantive unless limited to a non[]substantive purpose, such as impeachment," and "[t]here is no need to use this instruction when the earlier inconsistent statement is being offered as substantive evidence under [s]ection 115-10.1"). Trial counsel cannot be deemed ineffective for failing to request that the jury be instructed that it could consider Heindselman's prior inconsistent statement as substantive evidence because that instruction was unnecessary under the circumstances. Moreover, because the record establishes that trial counsel recognized the value of Heindselman's prior inconsistent statement and that the statement was admitted and used as substantive evidence, the defendant is unable to prevail on his claim that counsel's treatment of the statement constituted ineffective assistance of counsel.

The defendant next contends that his trial attorney was ineffective for failing to tender IPI Criminal 4th No. 5.01, which defines recklessness, the requisite mental state for involuntary manslaughter. IPI Criminal 4th No. 5.01 instructs that a person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard

15

of care which a reasonable person would exercise in the situation." The defendant points out that the Committee Note to the definitional instruction for involuntary manslaughter, IPI Criminal 4th No. 7.07, states that IPI Criminal 4th No. 5.01 should be given in conjunction with IPI Criminal 4th No. 7.07. IPI Criminal 4th No. 7.07, Committee Note, at 219. Citing *People v. Howard*, 232 Ill. App. 3d 386 (1992), the defendant argues that counsel's failure to tender IPI Criminal 4th No. 5.01 was reversible error. The State counters, "There is substantial evidence in the record to indicate that defense counsel's decision not to tender the IPI definition of recklessness was trial strategy," and the State argues that in *People v. Carlson*, 79 Ill. 2d 564 (1980), the supreme court rejected, on prejudice grounds, the defendant's claim that his trial counsel's failure to tender IPI Criminal No. 5.01 in conjunction with IPI Criminal No. 7.07 constituted ineffective assistance of counsel. Because we agree that the record indicates that counsel's decision to forgo tendering an instruction defining recklessness was a matter of trial strategy, "we need not consider the second prong of the *Strickland* standard" (*People v. Cunningham*, 376 Ill. App. 3d 298, 304 (2007)).

As previously noted, defense counsel elicited the following testimony from Dr. Lipman when asking about the defendant's state of mind at the time of the shooting: the defendant "behaved foolishly[,] *** even say recklessly," and the defendant did not "appreciate the dangerousness and, therefore, the recklessness of his actions." During closing arguments, when discussing the mental states of murder and involuntary manslaughter, counsel advised the jury that the judge, "in his instructions," was "going to define [']knowledge['] [and] [']intent,['] " but at the same time, counsel specifically referred to Dr. Lipman's testimony when discussing recklessness.

"Counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from

ineffective assistance claims" (*People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005)), and under the circumstances presented here, the defendant is unable to overcome the presumption that counsel's decision not to tender an instruction defining recklessness was a matter of trial strategy as opposed to incompetent oversight. Furthermore, we cannot say that counsel's decision to direct the jury's attention to Dr. Lipman's testimony and not request that the jury be instructed on the legal definition of recklessness was objectively unreasonable. The defendant's defense was largely premised on the evidence that he was extremely intoxicated at the time of the shooting, and counsel could have reasoned that the defense was better served by emphasizing Dr. Lipman's testimony and not tendering IPI Criminal 4th No. 5.01 with its "consciously disregards" language. The jury was instructed on the definition of involuntary manslaughter and the issues to consider, and through Dr. Lipman's trial testimony, counsel provided the jury with a concept of recklessness less stringent than the legal definition set forth in IPI Criminal 4th No. 5.01. It is axiomatic that "[t]he effort to confine instructions to those that best support the theory of the defense is what trial strategy is about." *People v. Trotter*, 299 Ill. App. 3d 535, 540 (1998). As an aside, we note that the defendant's reliance on *People v. Howard*, 232 Ill. App. 3d 386 (1992), is misplaced because *Howard* did not address a situation where trial counsel's failure to tender a recklessness instruction was a matter of trial strategy. See *Howard*, 232 Ill. App. 3d at 390-93. *Howard* also involved cumulative error, and a reversal of the defendant's murder conviction was deemed warranted "[b]ased upon the specific facts in [the] case." *Howard*, 232 Ill. App. 3d at 390, 392-93. In any event, because the defendant is unable to overcome the presumption that his trial attorney did not request a recklessness instruction as a matter of sound trial strategy, the defendant is unable to prevail on his claim that counsel's failure to tender IPI Criminal 4th No. 5.01 constituted ineffective assistance of counsel.

CONCLUSION

For the foregoing reasons, the defendant's conviction is hereby affirmed.

Affirmed.

GOLDENHERSH and CHAPMAN, JJ., concur.

NO. 5-07-0064

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
                                  ) Circuit Court of
    Plaintiff-Appellee,                   ) Edwards County.
                                  )
v.                                          ) No. 01-CF-49
                                  )
KENNETH R. LEMKE,               ) Honorable
                                  ) Mark L. Shaner,
    Defendant-Appellant.              ) Judge, presiding.

_____

**Opinion Filed**:          July 31, 2008

_____

**Justices**:         Honorable James M. Wexstten, J.

                 Honorable Richard P. Goldenhersh, J., and
                 Honorable Melissa A. Chapman, J.,
                 Concur

_____

**Attorneys**
**for**
**Appellant**
                 Daniel M. Kirwan, Deputy Defender, Lawrence J. O'Neill, Assistant Defender,
Office of the State Appellate Defender, Fifth Judicial District, 117 North Tenth
Street, Suite 300, Mt. Vernon, IL 62864

_____

**Attorneys**
**for**
**Appellee**
                 Hon. Brian T. Shinkle, State's Attorney, Edwards County Courthouse, P.O. Box
170, Albion, IL 62806; Norbert J. Goetten, Director, Stephen E. Norris, Deputy
Director, Sharon Shanahan, Staff Attorney, Office of the State's Attorneys
Appellate Prosecutor, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt.
Vernon, IL 62864

_____