2023 IL App (2d) 220441-U
No. 2-22-0441
Order filed August 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-324 |
| | ) | |
| TARA L. MADING, | ) | Honorable |
| | ) | Jody P. Gleason, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) Where defendant was charged with aggravated battery, defense counsel was not ineffective for abandoning a self-defense theory proposed in opening statement and contending in closing argument that she battered the victim in an uncharged incident but did not participate in the subsequent attack that was the basis for the aggravated battery charge. (2) Restitution for dental expenses not yet incurred was proper, but a remand was necessary for the trial court to determine whether restitution to the two recipients is due in single payments or installments.

¶ 2    Following a jury trial, defendant, Tara L. Mading, was convicted of aggravated battery

(720 ILCS 5/12-3.05(a)(1) (West 2020)). The trial court sentenced her to 24 months' probation

and 3 days in jail. In addition, the court ordered defendant to pay $44,546 in restitution. On appeal,

defendant argues that (1) she was denied her constitutional right to the effective assistance of counsel when her trial counsel (a) argued in his opening statement that defendant acted in self-defense but failed to offer a jury instruction on self-defense and (b) conceded in his closing argument that defendant committed battery but failed to offer a jury instruction on the lesser included offense of battery and (2) we should vacate the restitution order and remand the matter for a new hearing because the court (a) failed to set the manner of payment and (b) ordered defendant to pay for expenses that the victim had not yet incurred. We affirm defendant's conviction and the restitution order, but we remand to the trial court for the limited purpose of determining whether defendant is to pay the restitution in single payments[1] or installments.

¶ 3                                    I. BACKGROUND

¶ 4      On February 9, 2021, defendant was indicted on one count of aggravated battery stemming from an incident that occurred on November 10, 2020, between defendant and the victim, Megan Seifrid.[2] The indictment alleged that defendant "knowingly caused great bodily harm to *** Sefrid [*sic*], in that said defendant hit *** Sefrid [*sic*] in the face and head multiple times."

¶ 5      The following evidence was presented at defendant's jury trial. Seifrid testified that she was 37 years old. In June 2020, she began dating Philbert Griffin, whom she had recently met. They saw each other every day, and Griffin sometimes stayed at Seifrid's residence in Aurora.

---

[1]There would be at least two payments because there were two separate recipients: the victim and Rush Copley Medical Center, where the victim was treated.

[2]A second count charging mob action (720 ILCS 5/25-1(a)(1) (West 2020)) was dismissed by the State before trial.

Initially, Seifrid believed that their relationship was "exclusive." Seifrid met defendant around the same time that she met Griffin.

¶ 6     Seifrid testified that, sometime in July 2020 at about 2:30 or 3 a.m., she heard someone banging on her door, yelling and screaming. When she looked out the window, she saw defendant and two other females. Seifrid did not open the door. In October 2020, Seifrid and Griffin moved into an Aurora townhouse together. About a month later, around 1:30 or 2 a.m., Seifrid heard someone banging on the door, yelling and screaming. Seifrid recognized defendant's voice. Seifrid did not open the door. Seifrid began to suspect that Griffin was seeing other people, and, within a week, she put a tracking device on Griffin's car.

¶ 7     Seifrid testified that, at about 5 p.m. on November 10, 2020, she was monitoring the tracking device on Griffin's car and discovered that Griffin was at the Bristol Bay Condominiums complex (the complex) located in Yorkville, where she knew defendant lived. Seifrid was familiar with the complex because her brother, Ryan, also lived there. Seifrid called Ryan and arranged to meet him at the complex. Seifrid arrived around 5:35 to 5:45 p.m. and saw Griffin's car. After parking her car, Seifrid and Ryan knocked on defendant's door. Seifrid heard Griffin's voice, and she asked him to come outside. Seifrid heard defendant say "something about [Seifrid] banging on the tour [*sic*]," and Seifrid responded "[t]hat [defendant] done this to [Seifrid] at two in the morning." Seifrid did not have any weapons and made no threats. Neither Griffin nor defendant opened the door.

¶ 8     Seifrid testified that, after waiting at defendant's door for about two minutes, she walked away with Ryan and headed to her car, intending to leave. As she walked to her car, another car pulled up. The car stopped and three females exited—the adult driver and two teenage passengers. She identified the adult driver as "Renee." According to Seifrid, "Renee" also went by the name

"Cynthia."[3] The females began yelling and screaming at Seifrid and Ryan. Seifrid saw defendant running toward her, so she entered her car and drove to the parking area in a different part of the complex, where Ryan's friend Dylan lived. When she parked and exited her car, she saw Ryan, Griffin, and "two or three other guys" arguing. Dylan was also present. Seifrid saw "defendant *** coming towards [her] with [a] mug." Seifrid testified that "it look[ed] like a mason jar with a handle on it, glass mason jar." Seifrid also saw at least four or five other females running toward her.

¶ 9    Seifrid testified that, as the group approached her, defendant hit her three or four times with the glass mug. Seifrid was knocked unconscious on the fourth strike. When Seifrid was asked what the other females were doing before she went unconscious, she responded: "On top of me, kicking me. They were kicking my teeth. They kicked my teeth out. They kicked me in my face. They were just constantly kicking me." Seifrid was going "in and out" of consciousness. She testified that she was "[l]aying on the grass," "seeing stars," and "couldn't feel nothing." Some residents came out to help Seifrid; they brought her towels and tried to keep her awake. Eventually, an ambulance arrived and transported Seifrid to the hospital.

¶ 10    During her testimony, Seifrid identified several photographs that were admitted into evidence, including photographs of the location of the incident and her injuries. Seifrid testified that she suffered damage to her teeth—one was knocked out during the attack, and several others had to be removed. She sustained several cuts to her mouth and injuries to her head. The left side of her face was fractured. She required five stitches on her forehead and nine staples on the back

---

[3]This individual was identified in later testimony as "Cynthia Renee Gaskin." Thus, we refer to her as "Gaskin."

of her head. Her nose was broken and required surgery. Seifrid remembered being interviewed by a police officer in the hospital, but she "was bleeding so much that he *** couldn't continue with the interview."

¶ 11    On cross-examination, Seifrid testified that she knew where defendant lived because she had been there once before, when she went with Griffin to "get[ ] his stuff out of [defendant's] house." On the day of the incident, Seifrid sent Ryan to defendant's door before she arrived, and Ryan told defendant that Seifrid was on her way. When Seifrid arrived, she "bang[ed] on the door saying let's go[,] as in for [Griffin] to come outside." When Griffin did not come outside, Seifrid walked away. At that point, Gaskin pulled up, and Ryan began arguing with Gaskin and the two females in the car. Seifrid "had a couple words" with Gaskin and then saw defendant "running down the sidewalk." Seifrid entered her car, drove to another part of the complex, and parked. When she saw Ryan verbally arguing with Griffin and "whoever [Griffin] had with him," she exited her car to get Ryan. At this point, defendant approached and hit her with the glass mug.

¶ 12    Yorkville police sergeant Mitchell Carlyle testified that he was dispatched to the scene and arrived at the same time as another officer. Carlyle was "responding because of a 911 call from [defendant's residence]." However, when he arrived, he saw Seifrid lying on the ground with someone kneeling next to her and several other people present. He went first to check on Seifrid. Her face and head were very bloody, and she was actively bleeding. She was conscious but not talking clearly. He did not speak with Seifrid at the scene.

¶ 13    Carlyle testified that he made contact with defendant and Gaskin at the scene. They were looking for a cell phone. A cell phone was eventually located and returned to Gaskin. Carlyle observed neither Gaskin nor defendant holding a glass mug. When he asked defendant what had happened, "the first thing that she told [him] was that she didn't know what happened, she had no

part of it, and [she] continued to walk away from [him]." He let defendant walk away because he was unsure if she had been involved. After defendant was identified as the person who struck Seifrid, Carlyle went to defendant's residence to speak with her a second time. Carlyle spoke to defendant at the doorway to her residence. There were several unidentified people at the residence. This time, defendant told him that she had been in an altercation with Seifrid "right outside her door." Carlyle testified:

> "[Defendant] told me that *** Seifrid had arrived at her address to confront her ex-boyfriend over some issues. [Defendant] said that she came out to speak with [Seifrid] at which point *** Seifrid swung at her, if I remember her word correctly, and she said at that point she began to punch *** Seifrid out of self defense."

Carlyle did not see any evidence that a fight had occurred at the doorway; he did not see any injuries to defendant's face or hands. Although Carlyle saw "a large glass mug, [that] had a really thick bottom," he did not collect it, because he did not realize that it was relevant to the case. He noticed it only because it reminded him of a similar mug that he had when he was a teenager.

¶ 14    On cross-examination, Carlyle testified that he first mentioned the glass mug to someone on the morning of the trial. He could not say "with any certainty" where he observed it. He stated: "As best I can recall, it was near the residence or at the residence." If he had seen blood on the glass mug, he would have photographed it. The glass mug was not chipped or broken. He never saw anyone pick up the glass mug and did not know where it went. Carlyle spoke with Ryan, who was "highly emotional," but he did not observe "anything of note." He also spoke with Dylan.

¶ 15    On redirect examination, Carlyle testified that he attempted to have a conversation with Gaskin, but she and her two daughters refused to cooperate. Carlyle further testified that six or

seven 911 calls were made regarding the incident. "The original dispatch was a disturbance or suspicious person at [defendant's residence]."

¶ 16    The State rested. Defendant rested without presenting evidence.

¶ 17    The jury was instructed on the offense of aggravated battery. Defense counsel did not tender jury instructions on self-defense or the lesser included offense of battery. The jury found defendant guilty of aggravated battery. Defendant filed a motion for a new trial or, in the alternative, entry of judgment notwithstanding the verdict. The trial court denied the motion.

¶ 18    A sentencing hearing took place on December 6, 2022. Seifrid testified regarding her request for $44,546 in restitution. She identified the following exhibits that were admitted into evidence: (1) an account statement showing $15,977 in charges from Rush Copley Medical Center (Rush Copley) for services rendered because of the incident, (2) a statement from Northgate Dental Center showing $450 paid for an "interim partial denture" needed because of the incident, (3) a receipt from Bella Jewelry showing $1500 paid for a 14k gold chain that was ripped from Seifrid's neck during the incident, (4) a statement from Promenade Dental of Naperville showing $81 paid for dental X-rays needed because of the incident, and (5) an estimate from Chiann F. Gibson, DMD, in the amount of $26,538 for "Upper Cosmetic Restoration." Seifrid testified that she paid Northgate Dental Center, Bella Jewelry, and Promenade Dental the amounts reflected in the statements (the charges from Rush Copley were unpaid). The estimate from Dr. Gibson was for what the dentist believed was necessary to fix her teeth.

¶ 19    On cross-examination, defense counsel inquired specifically as to Seifrid's dental expenses. Seifrid testified that, before the incident, she had "veneers" on "[t]he top four teeth." She had them since she was "younger," and they were not removable. The estimate from Dr.

Gibson was not for her entire mouth, but only the four missing teeth. Seifrid did not receive government benefits or have her own insurance.

¶ 20 Defendant presented testimony from Gilbert Griffin.[4] Gilbert testified that he has known Seifrid for "two, three years." Gilbert knew that Seifrid had "dental work done" before the incident; he "thought it was dentures or something like that." He has seen her remove her front teeth to eat. He said "it was only two [teeth]" and "when she eats, she has to take them out." On cross-examination, Gilbert testified that the last time he saw Seifrid remove her teeth was in April 2021, which he conceded was after the offense. He did not know the condition of her teeth on the day of the offense, but only that she had dental work done. On redirect examination, counsel asked Gilbert whether he had seen Seifrid remove her teeth before defendant's arrest. Gilbert responded: "I don't want to lie. I can't remember." He followed up: "I want to say yes."

¶ 21 The trial court sentenced defendant to 24 months' probation, with 3 days in jail. The court ordered defendant to pay restitution as follows: $15,977 to Rush Copley and $28,569 to Seifrid, which included all amounts Seifrid had already paid, as well as the estimate of $26,538 from Dr. Gibson. The court stated: "You're going to need to pay the victim $26,538 for her to have her teeth fixed." The court did not set a deadline for payment. At the close of the hearing, the following colloquy occurred:

"MR. WEIS [(STATE'S ATTORNEY)]: Judge, the only question I have is did you want about a 20-month status date, just to see where she's at with the payments, as well as the counselling and stuff?

---

[4]It is not clear whether this is the same person referred to as "Philbert Griffin" at trial.

THE COURT: Does Judge Pilmer normally do 20 months as opposed to just 23 months?

MR. WEIS: 20 to 23 months, depending on what the court wants to do.

THE COURT: I would just say a 23-month date.

MR. WEIS: Okay. That's fine, Judge.

I could suggest then a date of November 5th."

The written "Supplemental Order of Restitution" provided: "The Defendant shall pay $44,546.00 as and for restitution by 11/5/24 9:00 a.m." It specified that Seifrid was to receive $28,569 (with bond applied first to this amount) and that Rush Copley was to receive $15,977.

¶ 22    This timely appeal followed.

¶ 23                              II. ANALYSIS

¶ 24                        A. Ineffective Assistance of Counsel

¶ 25    Defendant first contends that she was denied her constitutional right to the effective assistance of counsel when defense counsel (1) argued in his opening statement that defendant acted in self-defense but failed to tender a jury instruction on self-defense and (2) conceded in his closing argument that defendant committed battery but failed to tender a jury instruction on the lesser included offense of battery. Defendant makes clear in her reply brief that she is not arguing "that defense counsel chose the wrong theory to pursue nor is she faulting defense counsel for changing theories." Rather, she is arguing that counsel "failed to request the proper instructions" to support his theories.

¶ 26    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

- 9 -

That is, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Thus, to establish deficient performance, the defendant must overcome the presumption that the challenged action might be a " 'sound trial strategy' " under the circumstances. *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "Matters of trial strategy are generally immune from ineffective assistance of counsel claims." *People v. Jones*, 2023 IL 127810, ¶ 51. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test, and failing to satisfy either prong precludes a finding of ineffective assistance. *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004).

¶ 27    "Counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims." (Internal quotation marks omitted.) *People v. Lemke*, 384 Ill. App. 3d 437, 450 (2008). A

defendant is entitled to an instruction on self-defense even when only "slight" evidence supports it. *People v. Everette*, 141 Ill. 2d 147, 156 (1990). Failure to raise a viable claim that the defendant acted in self-defense may warrant a finding of ineffective assistance of counsel if no strategy justifies the omission. *People v. Haynes*, 408 Ill. App. 3d 684, 689 (2011).

¶ 28    However, while it is counsel's decision whether to assert an affirmative defense like self-defense (*People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40), it is the defendant's decision whether to submit an instruction on a lesser included offense (*People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994)).

¶ 29    "A person commits battery if *** she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a)(1), (a)(2) (West 2020). As is relevant here, "[a] person commits aggravated battery when, in committing a battery, *** she knowingly *** [c]auses great bodily harm ***." *Id.* § 12-3.05(a)(1). Ordinarily, "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." *Id.* § 7-1(a).

¶ 30    Defense counsel's closing argument, along with the trial evidence, shows the soundness of counsel's defense strategy and his decision not to tender a jury instruction on either self-defense or the lesser included offense of battery. To be sure, in his opening statement, counsel alluded to the defense of self-defense, stating that "at the end of this case, *** you will know that [defendant] is not guilty for defending herself." But during closing argument, counsel took a different approach. At the outset, counsel told the jury to "compare [the witnesses' testimony] with what exactly [defendant is] charged with." Counsel emphasized that, to prove defendant guilty of aggravated battery, the State had to prove that she "committed great bodily harm." Counsel

maintained that the State failed to prove that defendant was "involved" in the cause of Seifrid's injuries. He pointed to Carlyle's testimony and argued:

> "[Carlyle] noticed nothing on the defendant. He noticed nothing. No scratches and no bruises and no cuts and nothing. And what does nothing mean, ladies and gentlemen? Nothing means blood splatter, nothing means blood, and when you look at those images coupled by a glass that has no blood on it, it's not cracked."

¶ 31 Counsel argued that, to convict defendant, the jury would have to believe that defendant was "right there swinging," causing injuries "to the point that blood is gushing hours later," yet Carlyle did not "find one drop of blood." Counsel stated: "That, ladies and gentlemen, is how you know that as she is charged, *** [defendant] is not guilty of causing great bodily harm because the physical evidence and the lack thereof make it absolutely impossible." He asserted: "[T]here is no way that this defendant was anywhere near [Seifrid] *** when she was getting beaten."

¶ 32 In focusing on the required element of great bodily harm, counsel's all-or-nothing defense strategy is clear—requiring the jury to either find defendant guilty of aggravated battery or acquit her. Counsel emphasized: "They have the burden every single step of the way, every single step of the way, and they have to prove [defendant] committed great bodily harm. Not battery, not battery, and that's a charging decision." This was a valid trial strategy. See *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 29. "[T]he mere fact that an all-or-nothing strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." (Internal quotation marks omitted.) *Id.* (As noted, defendant does not argue that counsel chose the wrong defense theory.)

¶ 33 Defense counsel's concession during closing argument that defendant committed a battery is consistent with and, moreover, supports his defense strategy. He conceded that defendant

committed battery but *not* a battery that resulted in great bodily harm. Carlyle testified that defendant told him that when she came out to speak with Seifrid, she "began to punch *** Seifrid out of self-defense" after Seifrid first swung at her. This altercation occurred at defendant's doorway. Counsel argued: "[Defendant] admitted to hitting [Seifrid]. Charge her with simple battery." By focusing on Carlyle's testimony and conceding that defendant struck Seifrid at her doorway, counsel allowed the jury to find that Seifrid was involved in two distinct physical altercations—the first occurring between defendant and Seifrid at defendant's doorway and the second occurring between Seifrid and unknown assailants at a different location after Seifrid drove a short distance away and exited her car. The unrebutted testimony established that the altercation at the second location caused Seifrid great bodily injuries. Thus, counsel argued that, although defendant may have struck Seifrid during the altercation at her door (an uncharged simple battery), the evidence did not establish beyond a reasonable doubt that defendant was involved in the altercation at the second location (the charged aggravated battery). Counsel told the jury:

> "If you don't know what happened, she's not guilty. You have to be *** convinced beyond a reasonable doubt that [defendant] committed great bodily harm and *** Carlyle told you unequivocally, specifically, and with absolutely no doubt, there was no signs of anything on [defendant]. None.
>
> [Defendant] could have hit her earlier by the house. She's not charged with it. [Defendant] could have hit her in the driveway. She's not charged with it. [Defendant] could have hit her five times. And if it didn't—and if she didn't cause great bodily harm, she's not guilty."

¶ 34    Given the evidence, counsel's change in defense strategy—arguing that the State failed to prove beyond a reasonable doubt that defendant caused great bodily harm, and, thus, she was not

guilty as charged—was reasonable. Further, under this strategy, it was reasonable not to tender either a self-defense or a lesser-included-offense instruction. First, a self-defense instruction was unwarranted, because defendant's claimed act of self-defense took place during the altercation at the door to her residence, whereas the unrebutted evidence established that Seifrid suffered great bodily harm at the hands of several individuals *after* Seifrid left defendant's residence and drove to a second location. Counsel emphasized that defendant was not charged with battery based on any alleged actions at defendant's door. Further, even assuming defendant participated in the altercation at the second location, there was no evidence that defendant acted in self-defense *at that time*. Thus, it was not unreasonable for counsel to forego tendering a self-defense instruction where defendant's claimed act of self-defense was inapplicable to the charged offense and there was no evidence supporting a self-defense instruction as to that offense.

¶ 35    Second, it was not unreasonable for counsel to forego tendering a jury instruction on the lesser included offense of battery and, instead, attempt to obtain an acquittal. "Where a lesser[ ]included offense instruction is tendered, a defendant is exposing himself to potential criminal liability, which he otherwise might avoid, and is in essence stipulating that the evidence is such that a jury could rationally convict him of the lesser[ ]included offense." *People v. Medina*, 221 Ill. 2d 394, 409 (2006). Initially, we reiterate that counsel's concession that defendant committed battery concerned defendant's actions at her doorway—for which she was not charged—not her actions at the second location where the aggravated battery occurred. Moreover, counsel maintained that, based on Carlyle's testimony that he saw no blood on defendant or the glass mug, defendant was nowhere near the altercation when Seifrid suffered great bodily harm and, thus, she was not guilty of aggravated battery. Although an instruction on battery was a viable option (allowing the jury to find that defendant did participate in the altercation at the second

location but did not cause bodily harm), we cannot say that counsel's choice to take an all-or-nothing approach—requiring the jury to either find defendant guilty of aggravated battery or acquit her—was unreasonable.[5]

¶ 36                                    B. Restitution

¶ 37    Defendant contends that we must vacate the restitution order and remand the matter for a new hearing because the trial court (1) failed to consider defendant's ability to pay and set the manner of payment as required under section 5-5-6(f) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-5-6(f) (West 2020)) and (2) improperly ordered defendant to pay for "expenses" that the victim had not yet incurred.

¶ 38    Defendant acknowledges that she did not object either to the trial court's failure to follow the proper statutory procedure or to the scope of the restitution award. She concedes that, as a result, she has forfeited the issues. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a

---

[5]As already noted, it is the defendant's choice whether to submit a lesser included instruction. See *People v. Brocksmith*, 162 Ill. 2d 224, 229 (1994). Defendant asserts that there is no indication in the record that counsel ever conferred with defendant about whether to request the instruction. However, there is also no indication in the record that defendant requested the instruction and counsel refused it. Had this been shown, our conclusion might be different. We note that, although a defendant must generally raise a claim of ineffective assistance of counsel on direct appeal or risk forfeiting it, procedural default does not preclude a defendant from raising a claim on collateral review if it depends on facts not in the record. *People v. Veach*, 2017 IL 120649, ¶ 47.

written postsentencing motion raising the issue are required.") Nevertheless, defendant argues that we should review the propriety of the restitution order under the plain-error doctrine.

¶ 39    The plain-error doctrine is a limited and narrow exception to the general forfeiture rule. *Id.* at 545. To obtain relief under the plain-error doctrine, a defendant must show that a clear or obvious error occurred. *Id.* If a clear or obvious error is identified, a defendant may obtain relief if the error complained of meets either prong of the two-pronged plain-error doctrine. *Id.* That is, "[i]n the sentencing context, a defendant must *** show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.*

¶ 40    Defendant contends that the issues here are subject to review under the second prong of the plain-error doctrine. We agree. See *People v. Birge*, 2021 IL 125644, ¶ 50 (lack of sufficient evidentiary support for a restitution order is an error so serious that it affects the fairness of the sentencing hearing and, thus, second-prong plain-error review applied); *People v. D'Alise*, 2022 IL App (2d) 210541, ¶¶ 24-25 (reviewing, under the second prong of the plain-error doctrine, whether the restitution order properly indicated the time frame for the defendant to pay all restitution); *People v. Boots*, 2022 IL App (2d) 200640, ¶¶ 53-54 (the trial court's failure to set a deadline for payment of restitution was reviewable under the plain-error doctrine's second prong or, alternatively, under the catchall "in the interests of justice" exception to forfeiture).[6]

_____

[6]The State concedes that the issues raised by defendant are subject to second-prong plain-error review. We note, however, that the State, citing *People v. Day*, 2011 IL App (2d) 091358, ¶ 48, first maintains that "[a]ny portion of a sentence that is not statutorily authorized is void" and "may be attacked at any time." Thus, according to the State, "[a]s a threshold question, this Court

¶ 41    "Generally, a trial court's order for restitution will not be disturbed on appeal absent an abuse of discretion." *D'Alise*, 2022 IL App (2d) 210541, ¶ 26. However, we review *de novo* whether a court's order for restitution complies with section 5-5-6 of the Unified Code. *Id.* ¶ 27.

¶ 42                    1. Failure to Set Method and Manner of Payment

¶ 43    Defendant first argues that the trial court erred by failing "to set a method and manner of payment as required by statute. The State responds that the record, particularly the written order and the State's comments at the restitution hearing, indicates that the court intended installment payments.

¶ 44    Section 5-5-6(f) of the Unified Code (730 ILCS 5/5-5-6(f) (West 2020)) provides in relevant part:

> "Taking into consideration the ability of the defendant to pay, *** the court shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years, *** within which payment of restitution is to be paid in full. *** If the defendant is ordered to pay restitution and the court orders that restitution is to be paid over a period greater than 6 months, the court shall order that the defendant make monthly payments; the court may waive this requirement of monthly payments only if there is a specific finding of good cause for waiver."

A trial court's compliance with section 5-5-6(f) of the Unified Code is mandatory. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 82.

---

should consider whether the trial court exceeded its statutory authority. This is no longer the law. See *People v. Castleberry*, 2015 IL 116916, ¶ 1 (abolishing the " 'void sentence rule' ").

¶ 45    Here, the written restitution order provides that "[d]efendant shall pay $44,546.00 as and for restitution by 11/5/24 9:00 a.m." However, the order, like the remaining record, is silent on whether defendant was to pay the restitution "in a single payment or in installments[.]" 730 ILCS 5/5-5-6(f) (West 2020). In *People v. Fontana*, 251 Ill. App. 3d 694, 709 (1993), we overlooked the defendant's forfeiture and held that, although the trial court set the time for payment at five years, the court's failure to specify whether the restitution would be made in a single payment or installments required that the matter be remanded for that determination, taking into account the defendant's financial circumstances. We do the same here.

¶ 46    Nevertheless, the State argues that the written order, construed in light of the State's suggestion for a "status date, just to see where [defendant's] at with the *payments*" (emphasis added), indicates that the trial court intended for defendant to pay the restitution amount in installments, *i.e.*, "payments." We disagree. At the restitution hearing and in the written order, defendant was ordered to make payments to two separate recipients—Seifrid and Rush Copley. Thus, the State's reference to "payments" (plural) during the hearing could just as easily have referred to two separate lump sum payments that defendant was required to make and does not support an inference that the court intended that the payments to Seifrid and Rush Copley be made in installments.

¶ 47    Accordingly, we remand the case to the trial court for the limited purpose of determining whether defendant is to pay the restitution in single payments or installments, "[t]aking into consideration the ability of the defendant to pay[.]" See 730 ILCS 5/5-5-6(f) (West 2020).

¶ 48                              2. Estimated Dental Expenses

¶ 49    Defendant also contends that the trial court erred by ordering her to pay for dental expenses that Seifrid had not yet incurred. Defendant argues that, because Seifrid had not yet paid for the

dental work, it cannot be considered an "actual out-of-pocket expense[ ][.]" *Id.* § 5-5-6(b). The State responds that defendant's argument ignores the additional language in the statute that provides for a restitution award based on "losses, damages, and injuries." *Id.* We agree with the State.

¶ 50    Section 5-5-6(b) of the Unified Code (*id.*) provides in relevant part that, "[i]n fixing the amount of restitution to be paid in cash, *** the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim ***." The fact that Seifrid has not yet incurred any "out-of-pocket expenses" to repair the damage done to her teeth does not mean that she has not suffered "actual *** losses, damages, [or] injuries." *Id.* The estimate to repair the "damages" or "injuries" is sufficient evidentiary support for the court to rely on to assess the cash value of those "damages." The trial court did not guess or speculate as to that value; it relied on Dr. Gibson's estimate. Defendant was free to raise any challenges to the sufficiency of that estimate at the hearing. Indeed, defendant offered testimony from Gilbert suggesting that, contrary to Seifrid's claim, Seifrid did not have four permanent veneers before the incident but rather two removable dentures. This would suggest that Dr. Gibson's estimate was not an adequate measure of damages and that the $450 Seifrid paid to Northgate Dental Center for an "interim partial denture" was possibly sufficient to cover the damage sustained to her teeth. Of course, the trial court was free to reject that testimony.

¶ 51    Defendant also argues that "[w]hether Seifrid would actually get the dental work done was not guaranteed," and that "[i]f she chose to forego the treatment or chose a different, less expensive course of treatment, she would get a windfall." However, even if Seifrid decided to forego treatment, the actual damage to her teeth would remain. We fail to see how that amounts to a

windfall. And, again, any challenges to the validity of the estimate—for instance, that she could get the same work done for less—could have been raised at the hearing.

¶ 52    Defendant's reliance on *Birge*, 2021 IL 125644, and *People v. Adame*, 2018 IL App (2d) 150769, does not warrant a different conclusion. In *Birge*, the defendant was convicted of burglary and arson and ordered to pay the victim $117,230 in restitution. *Birge*, 2021 IL 125644, ¶¶ 1, 44. The supreme court found second-prong plain error, vacated the order, and remanded for a new hearing because the victim "merely described the general damage that occurred" to various "merchandise," "furniture," and a "building" but failed to present any "numerical evidence" to support the losses. *Id.* ¶ 49. Here, however, Seifrid presented numerical evidence of the cost of repairing her teeth.

¶ 53    In *Adame*, the defendant was convicted of misdemeanor theft of a 10-year-old credenza and ordered to pay $1100 in restitution. *Adame*, 2018 IL App (2d) 150769, ¶¶ 1, 6, 17. To show the credenza's value, the State offered an Internet listing showing the sales price of a new " 'average type' of credenza" made of different material. *Id.* ¶ 6. We found second-prong plain error, vacated the order, and remanded for a new hearing. *Id.* ¶¶ 17, 23. We stated: "The only evidence of fair market value was an online listing of a new credenza made of different materials. There was no evidence at all of the value of a 10-year-old maple credenza." *Id.* ¶ 17. (Also relevant in *Adame* was the fact that the trial court found the evidence insufficient to prove the defendant guilty of felony theft, which required proof that the credenza's value was over $500, and instead entered judgment on misdemeanor theft. *Id.* ¶ 7.) Here, unlike in *Adame*, Seifrid testified that she lost four permanent veneers during the incident, and the State presented evidence from which the trial court could ascertain the value of the damages suffered by Seifrid, *i.e.*, the estimated cost to repair her teeth.

¶ 54    Accordingly, we find no error in the trial court's restitution assessment for the damage done to Seifrid's teeth.

¶ 55                                    III. CONCLUSION

¶ 56    For the reasons stated, we affirm defendant's conviction and the restitution order, but we remand to the trial court for the limited purpose of determining whether defendant is to pay the restitution in single payments or installments, "[t]aking into consideration the ability of the defendant to pay[.]" See 730 ILCS 5/5-5-6(f) (West 2020).

¶ 57    Affirmed and remanded with directions.